## SUPREME COURT.

ALETHA G. DALLAS, by JOHN G. DALLAS, her guardian, *ad litem*, appellant, agt. JOHN S. FOSDICK, respondent.

The right to be educated in the common schools of this state, is one derived entirely from legislaton, and as such is subject to such limitations as the legislature may, from time to time, see fit to make. It is not a constitutional right.

The provision contained in the charter of the city of Buffalo, authorizing its common council to maintain public schools in said city, which shall be free to all white children, between certain ages, residing within their respective school districts ; and the provision that such common council may establish one or more pub lic schools which shall be free to the colored children of said city, as well as section one, of title ten, of chapter 1281, of the laws of 1864, by which a similar authority is conferred upon the school officers of all the incorporated cities and villages of the state; are not unconstitutional, nor contrary to the act of congress commonly called "the civil rights bill."

Under these provisions of the charter of the city of Buffalo, its common council may establish public schools *exclusively* for white children, and public schools *exclusively* for colored children.

*Eighth District, General Term, February*, 1869.
*Before* DANIELS, MARVIN and BARKER, *Justices.*

THE plaintiff, a colored girl of the age of thirteen years, residing with her parents in school district No. 11, in the city of Buffalo, brought this action for the recovery of damages which it was claimed in the complaint, she had sustained by reason of having been forcibly evicted by the defendant from public school No. 11, of said city.

The defendant, by his answer, alleged that at the time of such eviction, he was the superintendent of schools of said city; that by the provisions of the charter of said city, its common council were declared to possess the rights, powers and authority, and were bound to perform all the duties, in and for said city, of commissioners of common

schools; that they were also authorized, by the charter of said city, to maintain public schools therein and to make such ordinances as they might deem necessary for the prosperity, good order, and government of said schools; that by another provision of such charter, the public schools of said city were declared to be free to all white children over the age of five and under the age of eighteen years, residing within their respective districts in said city; and that in pursuance of the authority conferred by such provisions of said charter, the said common council had established the school in school district No. 11, mentioned in the complaint.

The answer further alleged that the said common council were also authorized by said charter, to establish and main-tain within said city, one or more schools which should be free to the colored children of said city, and that in the exercise of such authority, they had established, and that at the time of the said eviction, they were maintaining a free school for the colored children of said city; and that the common council had duly enacted an ordinance, which was still in force at the time of the said eviction, providing that schools should be maintained in each of the school districts then established, or thereafter to be established, to which should be admitted all the children of said city, be-tween the ages of five and twenty-one years, except colored children, and those promoted to the central school of said city, and providing also that all colored children residing in said city, should be permitted to attend the school for colored children, established and maintained as above stated; and that by the provisions of the charter, he was constituted the executive officer to carry into effect the provisions thereof, and the ordinances of said common council, in respect to the said public schools.

The answer further alleged that the plaintiff was a colored child, within the meaning of those terms as used in the charter; and that she came to the school kept in said district No. 11, and insisted upon remaining there, and at-

tending said school, and receiving instruction therein; and that the defendant in the discharge of his duty, as superintendent of schools, requested the plaintiff to leave said school, and informed her that she would not be permitted to attend said school; but that said plaintiff refused to leave said school, and insisted upon remaining therein; and that the defendant, using no more force than was necessary, thereupon took hold of the plaintiff and led her out of said school; and that the said act of the defendant was the eviction mentioned in the complaint.

To this answer, the plaintiff demurred, and her demurrer having been overruled at the special term, she, thereupon, appealed to the general term.

ALBERT G. STEVENS, *for appellant.*
DAVID F. DAY, *for respondent.*

*By the court,* DANIELS, J.—But one question is presented for the consideration of this court, by the demurrer in this case, and that is whether the plaintiff, who is a colored child, is lawfully entitled to attend a school provided by the city authorities, for the education of white children? The case involves no other right or privilege, claimed to be secured by the laws of this state.

The right to be educated in the common schools of the state, is one derived entirely from the legislation of the state; and as such, it has at all times been subject to such restrictions and qualifications as the legislature have from time to time deemed it proper to impose upon its enjoyment.

It is not one of those inherent and paramount rights which the people by constitutional provisions have placed beyond the reach and control of legislation. For the provisions of the constitution upon this subject require only that the capital of the common school fund, literature fund, and United States deposit fund, shall be preserved inviolate, and that the revenue of the common school fund

and twenty-five thousand dollars annually of the United States deposit, fund shall be applied to the support of the common schools. (*Article 9, Section 1, Constituion of 1846.*) How the revenue is to be applied is not declared, neither are any regulations concerning its application made by the constitution itself. That was, therefore, necessarily left to the action of the legislature. Under the restrictions imposed upon the funds and revenue derived from them by the article of the constitution just referred to, the legislature have ample and complete authority to prescribe and regulate the manner in which the revenue of the funds shall be applied towards the promotion of the objects for which they have been secured.

In the course of the execution of this authority, laws have been enacted under which the revenues derived from these funds, to the extent permitted by the constitution, have been devoted and applied to the support of common schools throughout the state.

But the legislation of the state concerning that fund, does not necessarily have any connection with the disposition which should be made of the controversy in the present action. For the right of a person to attend a public school, is nowhere made to depend upon the circumstances whether or not the school is in whole or in part maintained by the revenue derived from the common school fund. If public schools are provided and maintained by taxation, without receiving for that purpose any part of the revenue of the common school fund, it is difficult to see how the rights or privileges of the person attending such a school can be in any manner prejudiced thereby. The object which it has been the policy of this state to accomplish, is just as completely secured in that manner as it would be if such schools were maintained in part by the revenues of the fund, and in part by taxation. No objection, therefore, can exist to the legality of the creation of the public school, arising out of the fact that it may be required to be

maintained by taxation alone.   Hence, the legislation ap-
plying to this subject in the city of Buffalo, cannot be justly
assailed on this account as an unauthorized exercise of
legislative authority.

By this legislation, it was provided that all public schools
organized in the city of Buffalo, shall be free to all white
children between the ages of five and eighteen years, who
reside within their respective districts.   And that the com-
mon council shall provide and maintain one or more free
schools in the city, for the colored children thereof, and
shall raise all moneys necessary for that purpose by taxa-
tion.   (*Laws of* 1853, 487, *sections 5 and* 7.)   Before these
provisions were enacted, it had been generally provided by
statute that the common schools of the state should be free
to all children residing within the district, who should be
between the ages of five and twenty-one years, (2 *R. S.*
*5th ed.* 95, *section* 46,) which was sufficiently general in its
language to include white and colored children alike.   But
still the right which it secured was derived from and con-
ferred by the law, and it was liable to be modified and
changed by the same authority that had made the law.
And since the power of the legislature over the subject
was complete and ample, it could in the exercise of that
power, either repeal the law, and thereby defeat the right
altogether, or change and qualify it, or render the law in-
applicable in certain portions of the state, leaving the others
to be governed by its authority.   It becomes important,
therefore, to inquire what the legislature have done in this
respect, not what its constitutional power would properly
permit it to do.   For the latter furnishes no ground upon
which the authority of the legislature can be properly
questioned.

As already seen, before the act of 1853, to which
reference has been made, the privilege was conferred upon
all the children in the district, between the prescribed ages,
of attending the public schools.   And it is, therefore, to

be presumed that a change was intended to be made, in this respect, by the act of 1853. But that change was not for the state at large, but only for so much of it as was, or should be, included within the city of Buffalo. The object of this act of 1853, was to reorganize the local government of the city, and to confer upon it privileges and powers not conferred upon the state at large. And as a portion of the powers and privileges conferred, those relating to the schools of the city were included within the objects of the law. By the express language of that part of the law relating to the schools, the authorities of the city were required to organize schools for white children, which they could only do by excluding colored children from them. The nature of the power conferred to that extent, is necessarily exclusive. It is to organize schools not for white and colored children, but for white children as distinguished from the colored children of the city. Such an organization of the schools, therefore, as would permit them to be attended by the white and colored children alike, would be unauthorized by the authority conferred by the law. For the law is expressly made in such a manner as to create a more restricted authority. This view of the law is sustained and fortified by the obligation subsequently imposed upon the common council, to provide and maintain one or more colored schools, which shall be free to the colored children of the city. The language used is such as to render this an imperative duty. And that would not have been imposed upon the common council if it had not been intended by the previous enactment to exclude the colored children from the other schools organized by the city. For if they were to be at liberty to attend the schools organized for the white children, there would be no need of schools for the colored children alone. But as it was the intention of the legislature in providing for the organization of schools for white children to exclude the colored children from them, it became a consequent necessity, that

other schools should be provided for the education of the colored children, and to meet that necessity, the duty of providing and maintaining schools for such children, was imposed upon the common council of the city.

The necessary effect of these provisions of the city charter was to repeal by implication, so far as it included the city of Buffalo, the general provision of the previously existing statute, which allowed all the children of the district, without regard to color, to attend the public schools. For the provisions of these statutes upon this subject are directly in conflict with each other. Both cannot be observed and maintained together within the territorial limits included by the charter, for the privilege conferred upon all children, by the general law of attending the same public school, is very manifestly and strikingly in conflict with the provisions of the charter, which require that separate schools shall be provided and maintained for the white nd colored children of the city, and by which the latter constructively excluded from the schools provided for th rmer.

This separation of the schools provided for white and colored children appears to have constituted a part of the general policy of the state upon that subject. For in 1856 it was enacted that a school for colored children might be established in any city or town of the state (2 R. S., 5th ed., 129, § 199). And by an act passed in 1864, the power of separating the schools for white and colored children is conferred upon the school authorities of the incorporated cities and villages of the state. (Laws of 1864, 1281, § 1, tit. 10.) So that as the laws stand at the present time, all the cities and incorporated villages of the state, by the general laws, have power to separate the schools for white and colored children. And by the additional provisions of the charter of the city of Buffalo, this separation has been imperatively required to be made. The provisions contained in this charter are not affected by the act of 1864; for by the last section of that act it is expressly declared that the

act shall not impair, or in any manner affect or change any special law touching the schools or school system of any city or incorporated village of the state. (*Laws of* 1864, 1289, § 14.)

It was claimed upon the argument of the appeal taken in this cause, that the provisions of the charter, if they were to be so construed as to exclude colored children from the schools provided for white children, were inconsistent with the act of congress called the " civil rights bill," and had, therefore, become inoperative. But that is very clearly not the case. It was no part of the civil rights bill to regulate or provide for the enjoyment of rights or privileges of the nature of those in controversy in this case. A principal object of that act was to confer citizenship upon the colored people, and in that manner to abrogate the rule previously adopted by the supreme court of the United States in the decision of what is commonly known as the Dred Scott case. This was clearly and unequivocally accom plished. In addition to that, this act was intended to confer upon the colored people all the substantial rights of the citizen. And these, so far as they are affected by the act, are enumerated ln the first section, as the right "to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." (*Laws of Congress,* 1866, 27, § 1.) It is clear that the right or privilege of attending a school provided for white children is not among those included in this section. Nothing is contained in either of the succeeding sections of this act from which it is or can be claimed, that such a right or privilege can be derived, and it is, therefore, unnecessary that any particular reference should be made to them for the purpose of disposing of this case. They were enacted for the purpose of more effect-

ually securing and maintaining the rights conferred by and enumerated in the first section.

Under no view, therefore, that can be properly taken of the law on this subject, did the plaintiff have the legal right of attending the school from which she was expelled. For that had been provided for the education of white children alone, and by the provisions of the charter under which the school was organized, she, as well as all other colored children, were constructively excluded from attending it.

Courts of justice are not allowed to regard or disregard the laws on the ground of policy. The proper policy to be adopted by the laws, is a matter addressed solely to the legislature. Where they are constitutionally enacted, the powers and duties of courts are limited to ascertaining and determining the meaning of the laws, and when that has been done of carrying them into effect.

The order appealed from, must be affirmed with costs.

MARVIN, J., concurred; BARKER, dissented; DAVIS took no part in the decision, not having heard the argument.