The following opinion was delivered at special term on the original motion:
Neilson, Ch. J.
The question presented on this application for a mandamus is whether the board of education of this city can legally refuse to receive a colored girl of suitable age and condition in a school set apart for white children, on the ground that schools have been provided for colored children exclusively. It appears that the father, a citizen and a taxpayer, not willing that his'.daughter should attend the colored school, made several applications to have her admitted to the school where the white children at tended, which were refused. He therefore invokes the aid of this court. We think the writ of mandamus should not be granted, for the following reasons:
First. The legislature having provided that the board of education should have the control and direction of all the public schools of the city, and also that schools might be established for colored children, the board, acting on the authority thus conferred, have provided for the instruction of white and of colored children in separate schools. It appears from the proofs before me that the school which this girl, Theresa, could attend, is in every respect suitable, the teachers and the means of instruction equally as good as those of the other school. It is apparent that when the legislature authorized the erection of schools for colored *189 children, it was intended that they should be taught there, the separation of schools and the separation of scholars calling for the exercise of the same authority.
Secondly. In several well-considered cases in the courts of this State, and of other States, the policy of having such separate schools has been approved and careful attention given to the objections involved. In the case of the People ex rel. Johnson y. Walsh, opinion by Judge Gilbert, it was held that a colored child was not entitled to attend the school set apart for white scholars, and a mandamus was refused. The same doctrine, illustrated by various courses of reasoning, was applied in other cases (40 How. Pr. 249 ; 21 Ohio, 198 ; 8 Am. R. 713 ; 17 Id. 405, 738 ; 13 Abb. Pr. N. S. 159. See also same doctrine in United States v. Benton, 13 Reporter, 360).
In Roberts v. City of Boston (59 Mass. 198), Mr. Charles Sumner, of counsel, stated truly that the courts of that State had never admitted any discrimination, founded on color or race, in the adminstration of the common schools, "but had recognized the equal rights of all the inhabitants. The opinion in the case was delivered by Chief Justice Shaw, who held that the general school committee of the city had power to make provision for the instruction of colored children in separate schools established for them, and to prohibit their attendance upon the other schools. In the several cases to which we have referred the courts recognize the authority of the State to delegate to school trustees or boards of education the right to establish separate schools, and to provide for the instruction of colored apart from white children. They also dispose of the suggestion that such classification violates the fourteenth amendment of the constitution of the United States. The exception to the power to exclude colored children from the schools intended for white, arises *190 when separate schools for the former have not been provided. In such a case the exclusion would be a denial of the right to acquire an education, and therefore contrary to the policy of the law.
Thirdly. The argument of the learned counsel for the relator assumes that there has been in this instance a discrimination against the colored race. If the case appeared to me in that light I should grant this application regardless of the cases cited, though of great weight and authority. But in my judgment the discrimination has been in favor of this child. A school has been provided where she can be taught, and where, in the social fellowship of her mates, she would have what youth always craves—sympathy and encouragement. The question is not to be treated as one of exclusion, though that may be incidentally involved. We have rather to maintain affirmative rights granted and secured to this child, a beneficent policy adopted, with a tender regard for the welfare of children of every class.'
The application fora mandamus must be denied, but without costs.
F. W. Catlin (Tracy, Catlin & Hudson, attorneys), for appellant. I. Even before the adoption of the fourteenth amendment to the constitution of the United States, the Board of Education had no power to exclude children from the various public schools in Brooklyn—the schools attended by white children, that is—solely on account of color. 1. The only statute that can be appealed to as giving the board this power is the special law passed in 1850, to reorganize and regulate the common schools in Brooklyn (L. 1850, cl 109). 2. There is nothing in this act of 1850 which authorizes the exclusion from the public schools in the various districts of any child solely on account of color. It is stated by Judge Neilson in his opinion, and is conceded, that until the actual establishment of *191 schools for colored children, these children would have a right to go to the schools attended by white children. The act of 1850 having been the first act authorizing the establishment of colored schools in this city, it follows that previous to 1850—and indeed for so long a period after 1850, as the' city actually remained without a colored school—the colored children were entitled to make use of the schools attended by white children. The colored children having this right-, how could the fact of the establishment of one or two colored schools by the Board of Education in any way interfere with it ? How could the establishment of one or two colored schools by this board have the effect of authorizing it to force the colored children out of schools which previously they had an unquestioned right to attend % The legislature, when it authorized the establishment of colored schools undoubtedly had in mind the fact that the colored people naturally huddle together in particular localities. It therefore gave the Board of Education power, in case it deemed it expedient, to establish in any locality where they might collect, a school for their benefit. But how this power can be said to carry with it the power to exclude colored children, living a mile or two miles from any colored school, from the regular schools belonging to their respective districts, it is difficult to see. It is clear, indeed, that such is not the case. The sectiop of the act providing for the establishment of colored schools clearly contemplated something additional to the established system, and did not give the Board of Education power to interfere with the existing rights of the colored children. It will be seen that the Legislature does not direct that colored schools be established ; neither does it interfere with the right of the colored children to attend the public schools. If it had intended that these children should be excluded from all the public schools in Brooklyn, and only be allowed the privilege *192 of attending the two or three colored schools that might be established, it would either have directly excluded them itself, or have given the Board of Education power to do so in unequivocal language. The legislature, in 1853, in an act to revise the charter of the city of Buffalo, used very clear and specific language in providing that certain schools should be for the exclusive use of white children and certain others for the exclusive use of colored children. Sections 5 and 7, of title XI. of chapter 230, of the Laws of 1853, read as follows : “ Section 5. All the public schools organized in the city of Buffalo shall be free to all white children over the age of live years.” “ Section 7. The common council shall provide and maintain one or more free schools in the city for the colored children thereof.” Judge Daniels argues in Dallas v. Fosdick (40 How. Pr. 249), that by the use of this peremptory language, the legislature intended that colored children should not attend the schools provided expressly for white children ; and there can be little doubt as to the propriety of drawing such a conclusion from such language. In Indiana and California the legislatures we>’e equally explicit in separating the white and colored children.' In California the statute read : “ Education of children of African descent and Indian children shall be provided for in separate schools.” The court held that in the face of this statute it was not within the discretion of the school authorities to admit colored children into the schools provided for white children; that it would be against the law to do so (Ward v. Flood, 48 Cal. 36; 17 Am. R. 405). In Indiana the statute read : “ The trustee or trustees of each township, town or city shall organize the colored children into separate schools.” It was held that colored children must attend these schools (Corey v. Carter, 48 Ind. 327; 17 Am. R. 738). It is submitted that the legislature in 1850 would have been equally explicit—would have *193 used language susceptible of only one interpretation— if it had intended.that there should be any discrimination against the colored children. 3. As a matter of fact, the power vested in the Board of Education to establish colored schools, if it should deem it expedient, did not necessarily carry with it the power to exclude the colored children living within the various districts from the schools belonging to these districts; the possession of the power to organize public schools by the board being perfectly consistent with the possession by every colored child of the privilege of attending the public school in his district. This being so, the court would not be warranted in so construing the statute as to give the board that power. “A power claimed in derogation of individual right ought not to be allowed upon a doubtful construction merely” (Beaty v. Knowler, 4 Pet. [U. S.] 152; Wright v. Briggs, 2 Hill, 77; People v. Lambier, 5 Den. 9). “ Every statute that affects even the estate of a citizen must be strictly construed. . . . The right to take private property without the owner’s consent cannot be made out by doubtful inferences. Nothing short of express words or necessary implication will answer the purpose” (Sharp v. Spier, 4 Hill, 76). 3. Even if-it could be held that the statute of 1850 authorized the discrimination complained of, still in 1851 a statute was passed which expressly took away any right to discriminate which the board might have possessed under the act of 1850. Section 1, of chapter 151, of the Laws of 1851, provides that “The common schools in the various districts of the State shall be free to all persons residing in the district over five and under twenty-one years of age.” This section applies to every school district in the State, and Judge Daniels holds in Dallas v. Fosdick (40 How. Pr. 249), that by it all the public schools are made free to colored and white children alike.
*194 II. If at the time of the adoption of the Fourteenth Amendment there was any law in this State which authorized the Board of Education to exclude children from the public schools solely on account of color, this law was invalidated and made incapable of enforcement by the amendment, and cannot now be appealed to by the board to uphold its action in excluding the relator from Public School No. 5. 1. The true interpretation to be"put upon this amendment is indicated in several recent cases (Strauder v. West Virginia, 10 Otto, 303 ; Virginia v. Rives, 10 Otto, 313-18 ; Exp. Virginia, 10 Otto, 339; Slaughter House Cases, 16 Wall. 36; Neal v. State of Delaware, 23 Alb. L. J. 466). 2. This amendment thus insures to the colored people rights equal to those that the white people enjoy ; all possible legal discrimination is done away with, and they are put upon a level with white people ; their rights are to be exactly the same as the rights of white people; they are to have all the rights that white people enjoy. It is conceded that the relator was excluded from School No. 5. solely because she was a colored child, and that in all other respects she was a tit and proper person to be admitted into the school. If, therefore, any law of the State sanctioned her exclusion on this ground, it clearly authorized her to be branded and discriminated against, and .was thus directly in conflict with the Fourteenth Amendment, and incapable of enforcement. It is perhaps proper in this connection to call the attention of the court to a very able article in The Independent of May 11, 1882, by Dr. S. T. Spear, author of “The Law of Extradition,” in which, referring to the United States supreme court cases ¿ited above, and to the recent Kansas case 25 Alb. L. J. 289), he says : “We sincerely hope that some colored man, whose child may have been subjected to this distinction will have the pluck to pursue the case, if necessary, to the supreme court of the *195 United States and obtain its judgment upon the question. That court can decide cases only as they come to it, "and it so happens that no case involving the question of ‘ Nigger schools ’ has ever reached it. Judging, however, from its decisions in other cases, there cannot be much doubt as to how it would decide this point. The principle which it has uniformly applied is, that no discriminations, by State law, or in its administration, between citizens of the United States, having their basis in race or color, are compatible with the recent amendments to the national constitution. The two races, being.citizens of the United States and of the respective States in which they reside, stand, in view of this instrument, upon exactly the same level, and any authority exercised under State law which in practice changes this fact, in any form or to any extent, is in conflict with the supreme law of the land.’ ” It seems to us that in a case like the one now under discussion, the civil rights act of this State authorizes the State courts to arrive at the same conclusion that would undoubtedly be arrived at by the United States supreme court if the case were in that court.
III. The civil rights act of this' State, passed in 1873, repealed and annulled any law existing at the date of its passage—if any such law then existed— which authorized the exclusion of children solely on account of color. 1. The court observes in Strauder v. West Virginia (supra) that if the States should not conform their laws to the requirements of the amendment, then, by the fifth section of the article of amendment, Congress was authorized to enforce it by suitable legislation. In 1873 the laws of this State were conformed to the requirements of the amendment by the act above referred to (L. 1873, c. 186), which reads as follows: § 1. ££ No citizen of this State shall, by reason of race, color or previous condition of servitude, be excepted or excluded from the full and equal enjoyment *196 of any accommodation, advantage, facility or privilege furnished by innkeepers, by common carriers, whether on land or water, by licensed owners, managers or lessees of theaters or other places of amusement, by trustees, commissioners, superintendents, teachers and other officers of common schools and public institutions of learning, and by cemetery associations. § 2. The violation of any part of the first section of this act shall be deemed a misdemeanor, and the party or parties violating the same shall upon conviction thereof be subject to a fine of not less than fifty dollars, or more than five hundred dollars. § 3. Discrimination against any citizen on account of color by the use of the word ‘ white ’ or any other term in any law, statute, ordinance or regulation now existing in this State is hereby repealed and annulled. § 4. This act shall take effect immediately.” The object of this act being to conform the laws of this State to the requirements of the constitutional amendment, to bring its principles directly home to our own citizens, the courts, in construing the act, should follow the United States supreme court in its construction of the amendment and of the act of Congress called the civil rights act. This seems too obvious to require any extended remark. Thus construed, the statute plainly prohibits the exclusion of colored children from the schools belonging to the districts in which they live, solely on account of color, and repeals and annuls any act which authorized their exclusion, if any such existed. 1. The first section of the act says in substance that no colored person shall be excepted or excluded from the full and equal enjoyment of any accommodation, advantage, facility or privilege furnished by trustees, commissioners, superintendents, teachers and other officers of public schools. The advantages and privileges of these colored people are thus to be full and equal—that is, of course, equal to those enjoyed by white people. In other words, *197 every accommodation, advantage, facility or privilege furnished by school officers to the white people, must be furnished to the colored people exactly as though they were white. It appears by a pamphlet issued by the Board of Education, purporting to give the number and location of the various schools in the city for the years 1881-2-—the pamphlet was used on the argument at special term, and was conceded to be correct in this particular—that there are forty-three regular district schools, and ten primary schools, and in addition to these three regular schools for colored children, and one so-called colored school, occupying a few rooms in Public School No. 1. One of these regular schools is on Willoughby street near Raymond street, another on Troy avenue near Bergen street, and the third on Union avenue near South Third street. The one on Troy avenue is about three miles from the one on Willoughby street, and the one at Union avenue is about the same distance from each of the others. The Board of Education can exclude the colored children from the district schools only on the theory that the full and equal enjoyment of any accommodation, advantage, facility or privilege furnished by commissioners, superintendents and other school officers, and guaranteed to the colored people by the act of'1873, would not be abridged by confining these people to three or four colored schools, while people other than those of African descent might enjoy the advantages and facilities of fifty-three schools. But it needs no argument to show that the advantages and privileges of these people would be seriously abridged by confining them to three or four colored schools. While the colored people are inclined to settle in particular localities, it is still true that they are scattered throughout the city. If the colored schools were the only ones open to them, would the children living in district No. 10, near Greenwood—those living in dis *198 trict No. 97, near Gowanus—those living in district No. 22, in Greenpoint—have the same advantages and facilities that are enjoyed by the white children in those districts % Clearly not. The white children could attend the district schools while the colored children would be obliged to travel two or three miles to a colored school. Does the relator have the same advantages as the white children living in her neighborhood % Clearly not. These white children may attend the first-class school belonging to the district, while she must go ten blocks away to a little fourth-class colored school, with miserable surroundings. 2. But the act goes further. Section 8 says that discrimination against any citizen, on account of color, by the use of the word “ white,” or any other term, in any law, statute, ordinance or regulation now existing in this State, is thereby repealed and annulled. Admit that prior to 1873 the school authorities had the right, by virtue of any law of the State, to exclude colored children from the regular public schools, and compel them to go to colored schools—had the right, in other words, to discriminate against them—still this law was completely done away with by the civil rights act. Any law which established, or authorized the board of education to establish, schools expressly and exclusively for ££ white” children, the colored children thus being excluded and discriminated against, was done away with by this act. It follows, therefore, that the exclusion of the relator from the-school in question was totally unauthorized. 3. But it is said that just discrimination is still allowable ; that it is perfectly just and proper to exclude the colored children from the district schools, and confine them to the three or'four colored schools, and therefore there is really no discrimination against them. It is said that when the relator is excluded from the regular school, which is one block away, and compelled to go, if at all, to a little colored school ten blocks away, she *199 is not discriminated against at a,ll, but has exactly the same rights as her white neighbors. So far as the relator is concerned, excluding her from a school one block from her house and compelling her to travel ten blocks to a school, simply because her complexion is dark, is an unjust and unwarrantable discrimination, and is condemned by the civil rights act if that act is not a dead letter. But this act prohibits mere discrimination, not unjust discrimination only. And when a statute is thus clear and specific, where is the warrant for interjecting into it a broad qualification ? How can it be held to mean what its language does not express ? It is discrimination that is prohibited. The schools belonging to the various districts are to stand open for the children living within them. When a child presents himself to any district school and asks to be admitted, the question of his complexion must be ignored entirely. He can only be asked whether he lives within the district and is of the proper age. Even before the constitutional amendment and the act of 1873, there was no attempt made to exclude the colored people from theaters and inns, and other places of a like nature. The proprietors of these institutions simply put them in a separate apartment by themselves, or otherwise prevented their association with white persons— claiming of course that there was no unjust discrimination in this. If it is now held that under the act of 1873, innkeepers, theater managers and school boards may discrimina te, provided such discrimination is not in their opinion unjust, they may do just what was done before, namely, prevent the association of colored with white people in the manner above indicated, and inflict upon the colored people all the disadvantages that they formerly suffered. But no one can deny that the colored people acquired new political and social rights under the fourteenth amendment. The legislature, when it passed the act in question, must have *200 had this in mind, and contemplated some change in the law. It could not have intended to enact simply that the various persons named should treat the colored people just as they always had done. . It evidently meant to (and did) declare that there should be no more of this discrimination against people on account of peculiarities of complexion—that colored people should not be excluded from places where white people might go, because they were colored people—that,, in short, the question of complexion should not be taken into consideration in determining whether any person should be allowed access to inns, schools, theaters, cars, and so on. Of course, if a colored person is not fit to attend a school, or any other place, because he is personally objectionable—because he is unclean, for instance —he should be excluded ; but he should be excluded on the ground that he is personally objectionable, and not because his skin is black. 4. It will not do for the Board of Education to say in answer to the charge of excluding the relator from School No. 5, that she was directed to go to a colored school, only nine blocks further from her home than No. 5, and, in the opinion of the board, a most excellent institution. This is a mere evasion of the law. The civil rights act provides in substance that there shall be no discrimination—no exclusion of persons from schools on account of color— and this makes the following case exactly in point: By the act of March 3, 1863 (12 U. S. Stat. at L. 805), congress granted certain privileges in the District of Columbia to a railroad company, providing in the grant ‘ ‘ that no person shall be excluded from the cars on account of color.” The company adopted a rule assigning a certain car for colored persons, and another “for white ladies and gentlemen accompanying them.” A colored woman, who had bought a ticket,' and taken her seat in the latter car, was forcibly ejected therefrom, and thereupon *201 brought a suit against the company, and obtained a judgment in her favor. The supreme court of the United States (in Railroad Co. v. Brown, 17 Wall. 445), sustainéd this judgment, holding, to quote the headnote of the case, that the provision in regard to exclusion from cars on account of color meant “that persons of color should travel in the same cars that white ones did, and along with them in such cars, and that the enactment was not satisfied by the company’s providing cars assigned exclusively to persons of color, though they were as good as those which they assigned exclusively for white persons and, in fact, the very cars which were, at times, assigned exclusively to white persons.” “That is,” says the court, in Board of Education v. Tennon (25 Alb. Law J. 289), commenting on the above case, “under this decision, railroad cars are not free to a person who is excluded from all but one of them ; and, on the same principle, schools are not free to a person who is excluded from all but one of them.” 5. Substantially the same view of this question has been taken by the courts in several of the States. In Board of Education v. Tinnon (supra), a Kansas case, the question was whether the Board of Education of the city of Ottawa had the power to establish schools for white and colored children, and to exclude colored children from the schools established for white children, for no other reason than that they were colored children. The court held that the board had no such power. This case points out clearly that the tendency of recent decisions and laws is against discrimination of any kind on account of color, and the attention of the court is particularly called to the case. In Iowa it has been held, that school boards cannot establish separate schools for the education of white and colored children and exclude colored children from schools established for white children (Clark v. Boon, 24 Iowa, 266 ; Smith *202 v. Directors, 40 Id. 518 ; Dove v. Ind. School Dist, 41 Id. 639). Under a Michigan statute, which provided that all residents of any district should have an equal right to attend any school therein, Judge Cooley held that it could not be seriously urged that with this provision in force, the school board of any district which is subject to it may make regulations which would exclude any resident of thfe district from any of its schools because of race, color, or religious belief, or personal peculiarities. It is too plain for argnm§nt that an equal right to all schools, irrespective of all such distinctions, was meant to be established” (People v. Board of Education, 18 Mich. 400). In Illinois the Board of Education of the city of Quincy divided the city into eight districts for school purposes, and adopted a rule requiring all children of African descent to attend one school specially designated for colored children, and excluding them from schools in other districts. The supreme court of the State held, in the case of one John Longress, that the regulations of the school board were in violation of the statute which prohibited directors and school officers from making and enforcing any regulation which would directly, or indirectly, exclude any child from the public schools on account of color. The court said that the free schools of the State were public institutions, and in their management and control the law contemplated that they should be so managed, that all children within the' district between the ages of six and twelve years, regardless of race or color, should have equal' and the same rights to be derived therefrom ; and concluded by saying that the board had no right to make and enforce the rule complained of (Longress v. Board of Education of City of Quincy, to appear in 101 Ill.). Even in Tennessee it is now recqgnized that the white man and the black man stand equal before the law. In 1879 certain persons in Tennessee were in- *203 dieted for playing cards with a negro, contrary to the provisions of a certain section of the code. The persons were convicted, but the appellate court reversed the conviction, saying : “ Our first impression was that this statute [the statute tinder which the persons were convicted] could stand in connection with the act of 1865 (Code, § 2645), and the changed condition of things resulting from emancipation. But on careful reflection we conclude the contrary to be the case. Section 4888 jvas evidently passed to meet the demand of the state of things of which slavery was a part. Its principle is a distinction between the races and a prohibition against the association of the white man with either the free negro or the slave of that period, which is involved in the indulgence in games of hazard or address. The negro now emancipated is equal before the law to the white man. It would be an unfair assumption to hold that a statute intended for an entirely different set of relations should be held to operate under the changed state of things now extant in our State. The equal rights of persons of color is recognized in its broadest extent by the act of 1865 (Code, § 2745) and subsequent sections, and all acts or parts of acts inconsistent therewith, expressly repealed. We think the spirit and purpose of this act are an implied repeal of § 4888, even if it is not to be held inoperative because of the changed position of the black race in our State, and because it was made to meet an evil now passed away.” 6. Of course, opposing counsel will cite to the court the case of People ex rel. Johnson v. Welch, and something should be said as to the opinion of Judge Gilbert in that case. Judge Gilbert commences his opinion by alluding to ‘‘regulations of the Board of Education requiring the colored child to attend a colored school.” We find no regulation of the board on the subject, except the one to be referred to hereafter, which is to the effect that the schools are *204 open to “children”—not white children merely—living in the districts within which the schools are situated. The laws of the State do not exclude the colored children from the schools. It can only be claimed that they give the board power to do so. The board can exercise this power only by passing a resolution in proper form. This it has not done. Another thing to be noticed in the opinion is the statement that prior to the civil rights act in 1873 the board had power to exclude colored children. This statement is founded on the section of the act of 1850, giving the board power to establish schools for colored children. It has already been argued in this brief that the board has no right to exclude the colored children from the district schools simply because it has power to establish additional schools for these children. But Judge G-ilbebt’s attention was evidently not called to the act of 1851 (c. 151), which expressly opens the schools in every district in the State to all children between certain ages, and which has never been repealed so far as this city is concerned. Judge Gilbebt holds that even if the civil rights act, passed in April, 1873, repealed or modified the previous laws to such an extent that colored children could no longer be excluded from the schools, still the amended charter, passed in June, 1873, expressly re-enact.ed the laws in existence previous to the civil rights act. This, it seems to us, is erroneous. The provision in the charter amendment to which the judge refers is as follows : “All the provisions of law relating to the present Board of Education of the city of Brooklyn shall apply thereto.” This does not re-enact anything. It simply says that the laws shall stand as they are. It is just as clear that it includes the civil rights act, as it is that it includes any other act relating to the Board of Education. Indeed, it seems to us that the charter amendment specially refers to the civil rights act—it being *205 the last act on the subject—as still applying to the Board of Education, together with all other acts not inconsistent with it. It is impossible to see how the charter amendment repeals anything in the civil rights act. Judge Hilbert thinks it absurd to say that Section 3 of the civil rights act means merely “discrimination against any citizen on account of color.” He holds that it means discrimination to the injury or prejudice of any citizen, and so on. With all respect we think the statute means what it says. Interpreted as Judge Hilbert would have it interpreted it accomplishes nothing, and the time spent in its enactment was wasted. But enough has been said on the point already. 2. Discrimination on account of color is certainly going out of fashion. It has already been abandoned everywhere except in the public schools. Having in view the recent utterances of the United States supreme court, and of several State courts, it is high time that the schools were rid of the abomination. It is a relic of the period when colored people had no rights, and it ought to be stamped out. It is clearly prohibited by the civil rights act of the State—if that act is operative to the extent of prohibiting anything— and is thus unlawful. Being unlawful, it should receive the condemnation it so richly deserves.
IV. Even if the Board of Education was empowered by any law of this State to exclude children from the public schools belonging to the districts in which they reside, solely on account of color, still, this power has never been exercised; and under the by-laws of the board as they existed at the time the relator was excluded from the school in question, she had the same right to enter the school that any other child residing in the district had. Of course, any regulation adopted by the board, which should apply only to one person, would not be a regulation in a legal sense, and would be absolutely void. Rules and regulations of such *206 bodies must be general and apply to all alike (People v. Thorp, 12 Wend. 184; see a specimen of such rule in Ward v. Flood, 17 Am. R. 405). Therefore, even if the board had passed a resolution expressly excluding the relator from school No. 5, such resolution would have been a mere direction contrary to the by-laws of the board—would have been an arbitrary and unfair proceeding against a particular child, and would have been illegal and void. But there is nothing which tends to show that the board has ever attempted to exclude any colored child from any public school. There is certainly nothing in the affidavits in the appeal book which shows that it has ever excluded the relator from school No. 5. Mr. Avila’s affidavit simply states that on February 7, 1882, the Board of Education referred the matter of the relator’s application to the law committee and the local committee to act for the board. That is, these committees were to act according to the rules and regulations of the board as they then existed, not to adopt any new regulation. Instead of acting according to the rules and regulations of the board, the committees acted directly contrary to them. They met on February 10th and ratified the action of the respondent in excluding the relator from school No. 5, and their action was clearly unauthorized and' void.
Y. The principal of the school was the proper person to make the defendant in this case (Morse on Banking, 137 ; see People v. Throop, 12 Wend. 183).
F. E. Dana, for respondent.- -I. This proceeding is improperly brought against the respondent, who is not an officer, but a mere employee of the Board of Education.
II. The writ of mandamus is a prerogative writ resting to some extent on the discretion of the court to grant or to refuse (Exp. Fleming, 4 Hill, 581; Van Rennselear v. Sheriff, 1 Cow. 501; People v. Contracting Board, 27 N. Y. 378). It will issue only in a case of *207 clear, not -of doubtful right (People v. Croton Aqueduct, 49 Barb. 259 ; Reeside v.Walker, 11 How. [ U. S.] 272). Generally it will not issue where the relator has a legal remedy by action for damages (People v. Supervisors, 11 N. Y. 563 ; People v. Mayor, 10 Wend. 393). Where a subordinate tribunal or body corporate is clothed with the exercise of judgment and discretion, they cannot be compelled by mandamus to decide in any particular way. Their determination is conclusive unless some mode of review is provided (Howland v. Eldredge, 43 N. Y. 457 ; Oneida C. P. v. People, 18 Wend. 79). Having exercised the discretion committed to them by ■ assigning the relator to attend Colored School No. 1, which is in her district, this court has no right to interfere by mandamus, whether the board has exercised the power wisely or not (People v. Easton, 13 Abb. Pr. N. S. 159).
III. On the merits this application should be denied. 1st. It is to be noticed that the return of the respondent is not denied and the facts stated therein must be taken as true, viz., that there is a colored school within District No. 5, and almost as near the relator as Public School No. 5, in which she will be afforded the same facilities as she could have in any white school, and that she has been assigned by the board, acting through its committee, to attend that school. 2d. By chapter 143, Laws of 1850 (Manual, p. 162), the Board of Education have entire charge and direction of all the public schools in the city of Brooklyn. By section 3 the whole city is a school district, and shall be divided by the board into as many districts as there are schools, for the purpose of determining the limits within which children may attend such schools. By section 4 they have power to organize and establish schools for colored children . . . , and adopt the necessary rules for the government of the same. By title X. of Laws of' 1864, chapter 555 (the General *208 School Law, Manual, p. 202), the school authorities of any city or incorporated village, the schools of which are or shall be organized under title 9 of this act, or under special acts, may, when they shall deem it expedient, establish a separate school or separate schools for the instruction of children and youths of African descent resident therein, and such school or schools shall be supported in the same manner and to the same extent as the school or schools supported therein for white children, and they shall be subject to the same rules and regulations, and be furnished with facilities for instruction equal to those furnished to the white schools therein. This act is applicable to the city of Brooklyn. By Laws of 1873, chapter 420, the Board of Education is continued with the same powers it then had. 3d. By law, therefore, the Board of Education was authorized to establish schools for colored children. As a matter of fact the colored school in District No. 8 affords equal facilities for the instruction and education of the relator, as Public School No. 8 would do. The distance of each from the residence of the relator does not vary materially, and there is no wrong or hardship to relator in assigning her to this school; in fact none is alleged, but the application is based simply on a positive right to attend No. 5 because the relator resides in that district. This right is insisted on without regard to any injury that may occur to others of her race in this city. The right to establish separate schools for colored children involves the right to assign colored children living contiguously thereto to attend such schools. If the board had not that power, there would be no use in establishing the schools. If it shall be decided that the board have not the right to say who shall attend such schools, there is no use in trying to maintain them, and they will be broken up, and the colored principal and teachers there employed dismissed. The opportunity for the colored race to *209 show that, with the same facilities afforded them as to the whites, they can maintain schools for their own race, will be lost in this city, at least, and a great injury done to the colored race through the pride and perversity of the father of the relator.'
IV. No right of the relator is violated by assigning her to attend this school. 1st. Neither the constitution of the United States nor the fourteenth amendment thereof affects the rights of the relator, and they have no application to this case. As Judge - Gilbert says, in People v. Welch, “ Common schools are a free public charity, and the benefits conferred are a free gift from the State. Participation in the privileges and benefits of common schools form no part of that body of political and civil rights which are protected and secured by fundamental law.” In People v. Easton (13 Abb. Pr. N. S. 159), this is so decided, and the right of a colored citizen to send a child to a school of his own selection is discussed and decided against him. People v. McCann (21 Ohio, 198), held that the act authorising classification on - the basis of color does not contravene the constitution of the State nor the fourteenth amendment of the constitution of the United States, and that colored children residing in either of the districts for white children are not, as a matter of right, entitled to admission into the schools of white children. This subject is also elaborately discussed in Ward v. Flood, 17 Am. R. 405 ; Cory v. Carter, Id. 738; Dallas v. Fosdick, 40 How. Pr. 249 ; State v. Duffy, 8 Am. R. 713 ; Roome's Law of Corporations, § 323. When under a statute making provisions therefor, separate schools for colored children are maintained, such children may be lawfully excluded from schools established for white children. 2d. About the time the order appealed from was made, Judge Baxter, in the United States circuit court, Ohio District (10 Fed. Rep.730), decided that separate schools *210 may be provided for colored children and if they were as accessible and afforded substantially equal educational advantages with those provided for white children, it is the duty of colored children to attend them, and they may be rightfully excluded from the schools provided for white children. The reporter adds a note that the weight of authority accords with the view of the learned judge that the fourteenth amendment still leaves it within the discretion of the legislature of the several States to provide separate schools for colored children. These cases maintain that equality of rights does not involve the necessity of educating white and colored persons in the same school any more than it does that of educating children of both sexes or of keeping different grades of scholars in the same school; that equality of rights does not necessarily imply identity of rights. Roberts v. City of Boston (59 Mass. 198), cited by Mr. Justice Fexlsok, in his fair and able opinion, is an authority of great weight, that the different States may make provisions for the instruction of colored children in separate schools maintained for them, and prohibit their attendance upon the other schools. The case of the Board of Education of Ottawa v. Turner (25 Alb. L. J. 288), decided by the Kansas supreme court, in no way conflicts with these cases. That decision is placed entirely on the ground that the legislature of Kansas had not given to the board of education of second class cities the power to establish separate schools for the education of white and colored children, and to séclude colored children from attending the schools intended for white children. 3d. The act of April 9, 1873, does not interfere with the rights of the board to establish colored schools and assign colored children thereto. This matter has been elaborately argued for the board by Hon. E. M. Cullen, now justice of the supreme court, •and discussed by Gilbert, J., in People v. Welch, and *211 Ms opimon herewith submitted is a full and able review of this subject. By the act of April 4,1850, it was provided that the “Board of Education shall have the entire charge and direction of the public schools, and may define the duties of its officers and committees and provide such rules and regulations for instruction and discipline in said schools as are not inconsistent with the laws of the State.” And the same act also conferred upon them the power to organize and establish schools for colored children, and to adopt the necessary rules for the government of the same (L. 1850, p. 238). The same power was conferred as heretofore shown by Laws of 1864, c. 555, title 10, Manual, p. 202. It can hardly be supposed that the legislature intended by the general language of the act of 1873 to repeal and undo this elaborate scheme adopted here and throughout the State for the benefit of colored children. The fair and legitimate inference from the language used is, that the legislature did not regard this scheme, so .elaborately provided and in which so much' money had been invested, and which had been ajoproved and fortified by so many decisions, as discriminating against colored children. In this connection it is to be observed that this act was passed April 9, 1873 (L. 1873, p. 303), and on June 28, 1873, or more than two months thereafter, the Board of Education was continued, and “all the provisions of law relating to the present Board of Education shall apply thereto;” except as to the appointment of members, and all acts inconsistent therewith were repealed. As Judge Gilbert well affirms, the effect.was to re-enact the laws in regard to colored schools. 4th. The act of 1873 reads “No citizens of this State shall, by reason of race, color or previous condition of servitude, be excepted or excluded from the full and equal enjoyment of any accommodations, advantage, facility or privilege furnished by trustees, *212 commissioners, teachers and other officers of common schools and public institutions of learning.” § 3. Discrimination against any citizen on account of color by the use of the word “ white” or any other term in any law, statute, ordinance or regulation now existing in this State, is hereby repealed and annulled. This last section evidently does not relate to common schools, but if it does, the answer is that there is no discrimination against colored children by assigning them to separate schools where they have -equal advantages than there is against girls or boys in assigning them to separate classes, and it is only discrimination against, that is abolished. It is not certain that the first sec-don of the act would include the board of education, out if it does, the relator has not been excepted or excluded from the full and equal enjoyment of any accommodation, facility advantage or privilege furnished by them. On the contrary, the school furnished for her affords her every facility and accommodation afforded to white children. Colored children probably have greater advantages and facilities than they would have if required to attend schools for white children. In fact, there is a discrimination in favor of colored children and teachers. A great opportunity is afforded by these separate colored schools to colored persons to file vate themselves and their race. If no such separate provision were made, very few, if any, colored people would have a chance to exercise their talents as teachers or acquire for themselves or their race the position which the profession of teaching gives them in the community. The relator herself, through the misjudged action of her father, should he be successful, would be deprived of all opportunity to attain a position as teacher-in the public schools, and any advantage such a position might give her. As a matter of fact, the practical working of the rule claimed by relator would be to convert the school in a district where the *213 colored population is large into a school for colored children, taught by white teachers, while the schools provided for them would have to be abandoned (People ex rel. v. Welch, Sept. 1875, MS. ; People v. Easton, 13 Abb. Pr. N. S. 159, and cases cited, supra).
McCue, J.
We are to decide whether the Board of Education of Brooklyn may set apart schools for colored children, and exclude them from the schools maintained for white children.
The act of 1850 (c. 143) expressly permits this separation. “TheBoard of Education shall have power to organize and establish schools for colored children.” Argument will rather obscure than expound the plain intent of this provision. It is at once authority and recommendation for the separation of the two races. The act of 1873 (c. 863) re-enacts all law applicable at its date to the existing Board of Education.
The relator contends that the fourteenth amendment to the federal constitution and civil rights bill of this State, both of which preceded the act of 1873, quoted (c. 863), had repealed and annulled so much of the act of 1850 as permits the separation of black and white children in the common schools, and forbade such separation in the future.
This fourteenth amendment has been expounded by the supreme court of the United States, in the Slaughter-house cases (16 Wall. 36). The court, to define the privileges and immunities protected by this amendment, considered it in two parts. “All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.”
Of this the court say: “The distinction between citizenship of the United States and citizenship of a State is clearly recognized and continued.....
“It is quite clear, then, that there is a citizenship of *214 the United States and a citizenship of a State, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual.”
The other clause of the amendment is the one invoked here. Its language is as follows: “ No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.”
Of this clause the court continues: “It is a little remarkable, if this clause was intended as a protection to the citizen of a State against the legislative power of his own State, that the words ‘citizens of the State’ should be left out, when it is so carefully used, and used in contradistinction to citizens of the United States, in the very sentence which precedes it. It is too clear for argument that the change in phraseology was adopted understanding^, and with a purpose.” “Of the privileges and immunities of the citizen of the United States, and of the privileges and immunities of a citizen of the State, and what they respectively are, we will presently consider; but we wish to state here that it is only the former which are placed by this clause under the protection of the federal constitution.”
It results in the case at bar that the right of the colored child before us, if it is a privilege or immunity of State citizenship, is not protected by the federal constitution.
The common schools of Brooklyn are founded by the State of New York and supported by State funds.
In Paul v. Virginia (8 Wall. 180), the supreme court, expounding the amendment, say: “It would be the vainest show of learning to attempt to prove by citations of authority that up to the adoption of the recent amendments no claim or pretense was set up that those rights depended on the federal government for their existence or protection, beyond the very few express *215 limitations which the federal constitution imposed on the States.”
This we believe to be the true test for ££ privileges or immunities of citizens of the United States.” The protection of these privileges of its citizens must not call the national government out of its limited sphere.
We quote again from Judge Miller’s opinion in the Slaughter-house cases: u Was it the purpose of the framers of the fourteenth amendment, by the simple declaration that no State shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States, to transfer the security and protection of -all the civil rights which we have mentioned from the State to the federal government ?- And where it is declared that congress shall have power to enforce that article,-was it intended to bring within the power of congress the entire domain of civil rights heretofore belonging exclusively to the States ?”
It is not within the sphere of the national government to regulate education. The citizen of the State must appeal to Ms own State law to protect and secure . this privilege.
In the State of New York this entails no hardship on the colored man. The civil rights bill passed in 1873 is broad and comprehensive. It rounds and fills out the older bill of rights, and enacts into positive law the fundamental principle of equality (L. 1873, c. 186):
. “ Section 1. No citizen of this State shall, by reason of race, color, or previous condition of servitude, be excepted or excluded from the full and equal enjoyment of any accommodation, advantage, facility or privilege furnished by.....trustees, commissioners, superintendents and other officers of common schools.”
Does the colored child in its common school, fully and equally with the white child in its common school, enjoy the educational privileges of Brooklyn ?
The answer must be yes, if the schools are equal. *216 Then there is no offense against the letter or spirit of this section, for there is no proof that the colored schools are not equal with the others (see United States v. Burton, 10 Fed. Rep. 730, and the reporter’s note of the cases and authorities there cited).
The incidental loss of white fellowship for the colored child is not within the statute. We agree with Judge Gilbert that “It is quite foreign to the object and purpose of the legislation respecting common schools to create channels of social intercourse” (see People v. Welsh, decision filed September, 1875).
The second and third sections furnish machinery tc enforce the principle of equality, enacted in the first section.
The second section makes offenses against the first a misdemeanor. The third repeals all law hostile to the first section.
We have concluded that the separation of white from colored children is not an offence against the first section. Therefore the act of 1850 is not hostile to the first section of the civil rights act, was unimpaired in 1873, and was re-enacted in that year, when the Board of Education was reorganized. Its permission protects the board and disposes of this motion.
It is to be observed that there was nothing in the papers on which the case was heard and determined by Judge Neilson, tending to show that the school which the colored girl could have attended, the teachers, books and modes of instruction were not as good in every respect as were provided for the white children. There was, therefore, no reason for imputing anything like an improper discrimination. If the policy of having separate schools be unwise it remains for the legislature of the State to make the correction.
Order affirmed, but without costs.
Reynolds, J., concurred.