THE PEOPLE, ex rel. THERESA B. KING, by Guardian, etc., Appellant, v. JOHN GALLAGHER, Principal, etc., Respondent.

Under the provisions of the Common School Act of 1864 (§ 1, tit. 10, chap. 555, Laws of 1864) authorizing the establishment of separate schools for the education of the colored race, in cities and incorporated villages, the school authorities therein have power, when, in their opinion, the interests of education will be promoted thereby, to establish schools for the exclusive use of colored children; and when such schools are established and provided with equal facilities for education, they may exclude colored children from the schools provided for the whites (DANFORTH and FINCH, JJ., dissenting).

The same power is given to the board of education of the city of Brooklyn by the acts relating to the public schools of that city (Chap. 143, Laws of 1850; § 1, tit. 16, chap. 863, Laws of 1873). (DANFORTH and FINCH, JJ., dissenting.)

The establishment of such separate schools for the exclusive use of the different races is not an abridgment of the "privileges or immunities" preserved by the fourteenth amendment of the Federal Constitution, nor is such a separation a denial of the equal protection of the laws given to every citizen by aid amendment.

The said statutory provisions, therefore, were not abrogated by said amendment (DANFORTH and FINCH, JJ., dissenting).

It seems that the "privileges and immunities" which are protected by said amendment are those only which belong to the citizen as a citizen of the United States; those which are granted by a State to its citizens and which depend solely upon State laws for their origin and support are not within the constitutional inhibition, and may lawfully be denied to any class or race by the State at its will and discretion (DANFORTH and FINCH, JJ., dissenting).

It seems, also, that as the privilege of receiving an education at the expense of the State is created and conferred only by State laws, it may be granted or refused to any individual or class at the pleasure of the State (DANFORTH and FINCH, JJ., dissenting).

Said statutory provisions were not repealed by the Civil Rights Act of 1873 (Chap. 186, Laws of 1873); they do not deprive colored persons of the "full and equal enjoyment of any accommodation, advantage, facility or privilege," within the meaning of said act; nor do they discriminate in any manner against them (DANFORTH and FINCH, JJ., dissenting).

All that is required by said act, or by the constitutional amendment, if applicable, is the privilege of obtaining an education under the same advantages, and with equal facilities, as those enjoyed by any other individual. Equality, and not identity of rights and privileges, is what is guaranteed to the citizen (DANFORTH and FINCH, JJ., dissenting).

*Board of Education* v. *Tinnon* (26 Kans. 1), *Clark* v. *Board of Directors, etc.* (24 Iowa, 266), *Smith* v. *Directors, etc.* (40 id. 518), *Dove* v. *Ind. School Dist.* (41 id. 689), *People, ex rel. Longress,* v. *Board of Education* (101 Ill. 308 ; 40 Am. Rep. 196), *People* v. *Board of Education* (18 Mich. 400), *C. R. R. Co.* v. *Green* (86 Penn. St. 421 ; 27 Am. Rep. 718), *Decuir* v. *Benson* (27 La. Ann. 1), *Donnell* v. *State* (48 Miss. 680 ; 12 Am. Rep. 375), *Coger* v *N. W. Union Packet Co.* (37 Iowa, 145), *R. R. Co.* v. *Brown* (17 Wall. 446), *Strauder* v. *W. Va.* (100 U. S. 303), distinguished.

(Argued June 18, 1883 ; decided October 9, 1883.)

APPEAL from order of the General Term of the City Court of Brooklyn, which affirmed an order of Special Term denying a motion for a writ of *mandamus* requiring defendant, as principal of public school No. 5, in the city of Brooklyn, to admit the relator to said school.

The material facts are stated in the opinion.

*F. W. Catlin* for appellant. Defendant was the proper person against whom to ask for a *mandamus.* (77 N. Y. 503–507 ; Morse on Banking, 137 ; *People* v. *Throop,* 12 Wend. 184 ; High's Extraordinary Legal Remedies, 217, § 311.) The action of the committees of the board of education and the principal of the school in excluding relator on the ground of color was unauthorized. (Laws of 1850, chap. 143, § 6 ; *Thompson* v. *Schermerhorn,* 6 N. Y. 92 ; *Birdsall* v. *Clark,* 73 id. 73 ; *People* v. *Throop,* 12 Wend. 184 ; *People* v. *Board of Education,* 18 Mich. 400 ; *Ward* v. *Flood,* 48 Cal. 36 ; 17 Am. Rep. 405 ; *Dallas* v. *Fosdick,* 40 How. Pr. 254 ; *Cory* v. *Carter,* 48 Ind. 327 ; 17 Am. Rep. 738 ; *Beaty* v. *Knowles,* 4 Pet. 152 ; *Wright* v. *Briggs,* 2 Hill, 77 ; *People* v. *Lambier,* 5 Den. 9 ; *Sharp* v. *Spier,* 4 Hill, 76.) The prohibitions of the fourteenth amendment are addressed to the States, and have the effect of invalidating any State law in conflict with them. (*Ex parte Virginia,* 10 Otto, 339–346 ; *Virginia* v. *Rives,* id. 313–318 ; *Neal* v. *Delaware,* 13 id. 370 ; *Strauder* v. *W. Virginia,* 10 id. 303, 309 ; *Slaughter-House Cases,* 16 Wall. 36 ; *Board of Education* v. *Tinnon,* 25 Alb. L. J. 289 ; *R. R. Co.* v. *Brown,* 17 Wall. 446 ; *Board of Education* v. *Tinnon,* 26 Kans. 1 ; 25 Alb. L. J. 289.) The

Civil Rights Act of this State, passed in 1873 (Chap. 186), repealed and annulled any law existing at the date of its passage, if any then existed, which authorized the exclusion of children from the public schools, or discrimination against them, solely on account of color. (Comm. on Written Laws, §§ 82, 192; *Board of Education* v. *Tinnon*, 26 Kans. 1; 25 Alb. L. J. 288; *Clark* v. *Board of Directors*, 24 Iowa, 266; *Smith* v. *Directors*, 40 id. 518; *Dove* v. *School District*, 41 id. 689; *People, ex rel.*, v. *Board of Education*, 101 Ill. 308; *People* v. *Board of Education*, 18 Mich. 400; *Cent. R. R. Co.* v. *Green*, 86 Penn. St. 421; *Decuir* v. *Benson*, 27 La. Ann. 1; *Donnell* v. *State*, 48 Miss. 680; *Coger* v. *Un. Packet Co.*, 37 Iowa, 145.)

*F. E. Dana* for respondent. The granting of a writ of *mandamus* is in the discretion of the court to which the application is made. (*Matter of Sage*, 70 N. Y. 220; *People, ex rel. Faile*, v. *Ferris*, 76 id. 326; *Matter of Gardner*, 68 id. 467; *Ex parte Fleming*, 4 Hill, 581; *People* v. *Common Council*, 78 N. Y. 56; *Van Rensselaer* v. *Sheriff*, 1 Cow. 501; *People* v. *Contracting B'd*, 27 N. Y. 378.) It will issue only in a case of clear and not of doubtful right. (*Matter of Gardner*, 68 N. Y. 467; *People* v. *Croton Aqueduct*, 49 Barb. 259; *Reeside* v. *Walker*, 11 How. [U. S.] 272; *People* v. *Leonard*, 74 N. Y. 443; *People* v. *Common Council*, 78 id. 56.) Generally it will not issue when the relator has a legal remedy by action for damages. (*Matter of Gardner*, 68 N. Y. 467; *People* v. *Sup'v'rs*, 11 id. 563; *People* v. *Mayor*, 10 Wend. 393; *People* v. *Easton*, 13 Abb. [N. S.] 159; *Robinson* v. *Chamberlain*, 34 N. Y. 389; *Howland* v. *Eldridge*, 43 id. 457; *Oneida C. P.* v. *People*, 18 Wend. 79; *People* v. *Leonard*, 74 N. Y. 443; *People* v. *Common Council of Troy*, 78 id. 33.) This proceeding was improperly brought against the respondent, who was but a mere employe of the board of education of the city of Brooklyn. (*Matter of Gardner*, 68 N. Y. 467.) The board of education had the right to establish separate schools for colored children and to assign colored

1883.]    PEOPLE, ex rel. KING, v. GALLAGHER.    441

Opinion of the Court, per RUGER, Ch. J.

children living contiguously thereto to attend them. (Laws of 1873, chap. 420; Laws of 1864, chap. 555, § 12; Laws of 1850, chap. 143, § 4; Laws of 1843, chap. 63; Laws of 1845, chap. 306; Laws of 1849, chap. 140; Laws of 1864, chap. 155, title 13, § 14; title 7, article 5, § 39; Gilmour's Code Public Instruction, 385.) Neither the Constitution nor the fourteenth amendment affect the rights of the relator or apply to this case. (*Slaughter-House Cases*, 16 Wall. 36; *Hall* v. *DeCuir*, 5 Otto, 485; *Missouri* v. *Lewis*, 101 U. S. 22; *People* v. *Easton*, 13 Abb. [N. S.] 159; *State* v. *McCann*, 21 Ohio, 198; *Cory* v. *Carter*, 17 Am. Rep. 738, 766; Acts session 1, 39 Cong. 222, July 23, 1866; Acts session 1, 39 Cong. 354, July 28, 1866; Acts session 3, 42 Cong. 260, March 3, 1873; *Wood* v. *Flood*, 17 Am. Rep. 405; *Dallas* v. *Fosdick*, 40 How. 249; *State* v. *Duffy*, 8 Am. Rep. 713; Roome's Law of Corporations, § 323; 10 Federal Reporter, 730; *Roberts* v. *City of Boston*, 59 Mass. 198; *B'd of Edn. of Ottawa* v. *Turner*, 25 Alb. L. J. 288.) The act of 1873 (Chap. 186), known as the Civil Rights Act does not interfere with the right of the board of education to establish colored schools and assign colored children thereto. (*People, ex rel. Johnson*, v. *Welch*, Sept., 1875, MSS. op.; *People* v. *Easton*, 13 Abb. [N. S.] 159.)

RUGER, Ch. J. The relator applied to the court below at a Special Term of the City Court of Brooklyn for a writ of *mandamus* against the respondent, then the principal of public school No. 5 of that city, after a refusal, to compel him to admit her to the privileges of a pupil at such school, which application was denied. This appeal is brought from the affirmance of such decision by the General Term of that court.

The relator is a colored female about twelve years of age, residing in public school district No. 5, of the city of Brooklyn, and would be entitled to attend that school but for the regulations of its board of education. By such regulations, schools for the exclusive use of its colored population of equal grade and educational advantages with its other schools were established at convenient and accessible points, and the colored

children residing in said city were duly assigned to the respective schools provided for them. One of these schools, and being that which the relator was assigned to attend, was located in the same school district in which she resided.

These schools have been presumably established and conducted for a period of years, and their adaptation to the accomplishment of the most efficient purposes of education has been subjected to the test of actual experiment and trial without any claim being made but that the system adopted has contributed to the best interests of both classes. The relator, however, complains, not but that she is receiving the highest educational advantages that the city is capable of giving her, but that she is not receiving those facilities at the precise place which would be the most gratifying to her feelings.

The question broadly stated presented by this appeal is whether the school authorities of that city have the right to classify the pupils in such schools in the administration of their authority to regulate the methods of education pursued therein, or whether the provisions of the Constitution of the United States require that each person attending such school, shall, without regard to sex, color or age, be awarded upon demand the same privileges in the same places and under the same circumstances as those enjoyed by any other scholar therein.

Such school authorities have determined, in the exercise of their discretion, that the interests of education may be best promoted by the instruction of scholars of different races in separate schools; and the question is now presented whether they are debarred by the law of the land from adopting those methods which in their judgment are the wisest and most efficient to accomplish the purpose intended.

Under our common school system its supervising authorities are necessarily invested with the exclusive right of determining all such questions as pertain to the exercise of the discretionary powers conferred upon them, and the natural and legal presumption in favor of the conscientious performance of official duty requires us to assume, in the absence of any evidence to

1883.] PEOPLE, ex rel. KING, v. GALLAGHER. 443

Opinion of the Court, per RUGER, Ch. J.

the contrary, that the classification in question inures to the educational advantage of the community.

That our common school system should be administered to the best advantage for all interests the most casual reflection as well as the uniform practice in educational institutions shows that its school authorities should be vested with large discretionary power in arranging and classifying the various departments of public instruction, to adapt them to the diversified capacity, disposition and needs of the numerous persons they are required to govern and instruct, and any arbitrary interference with the exercise of such discretion, it is obvious, must be productive of injury to the cause of education.

It would be unfortunate if it should be found that any imperative rule of law prevents those who are charged with the management of the common schools of the State, from adopting such arrangements for instruction as their experience had shown to be adapted to the highest educational interests of the people. Upon referring to the various statutes on the subject, we find that the regulations referred to are fully authorized by the laws of this State relating to the management and control of its public common schools. Section 1 of title 10 of chapter 555 of the Laws of 1864 specially provides for the establishment of separate schools for the education of the colored race, in all of the cities and villages of the State, wherever the school authorities of such city or village may deem it expedient to do so. The act containing this provision has been, since its enactment, frequently before the legislature for amendment, and the provision in question has apparently been frequently approved by them, and now remains unchanged. The system of authorizing the education of the two races separately has been for many years the settled policy of all departments of the State government, and it is believed obtains very generally in the States of the Union.

The common schools of Brooklyn are organized and conducted under a special act relating to that city, contained in chapter 143 of the Laws of 1850, which confers upon the board of education of such city "the entire charge and

direction of all its public schools," and the right to " make its own by-laws, keep a journal of its proceedings, define the duties of its officers and committees and prescribe such rules and regulations for instruction and discipline in the said public schools as are not inconsistent with the laws of the State." Section 4 of this act reads as follows : " The board of education shall have power to organize and establish schools for colored children, and such evening schools as it may from time to time deem expedient, and shall adopt the necessary rules for the government of the same." " No person shall be prohibited from attending the evening schools on account of age."

The powers conferred upon the board of education by this act were, by section 1, title 16, chapter 863 of the Laws of 1873, made applicable to the reorganized department of public institutions for such city, created by said act.

This law has, therefore, been in existence for over thirty years, and its operation and effect have hitherto been found unobjectionable and apparently satisfactory to all parties.    It thereby appears that the board of education of Brooklyn possesses full legislative authority, in the exercise of its discretionary powers, to maintain separate schools for the education of white and colored children in that city, and the consequent power to render effectual, by the exclusion of one class from the schools designed for the other, of the discretion in regard to that subject which is conferred upon them by the statute. All of the powers necessary to accomplish the object which the legislature had in view in authorizing separate places of education for individuals of different color must be intended to have been granted when the authority to establish such schools was conferred.

The mere right of establishing such separate schools, stripped of the power of determining the persons who might or might not attend them, would be a barren power, productive of no beneficial result, and destructive of the effect of the legislation referred to.

Neither is there any force in the claim made by the relator, that the act excluding her from common school No. 5 was

not the act of the board of education of Brooklyn. Such a claim is not made in the petition or affidavit upon which her application is founded, and the case was heard upon the return of the respondent, in which it was distinctly asserted that the exclusion of the petitioner from public school No. 5 was effected in pursuance of the orders and instructions of the board of education of the city of Brooklyn. This statement was not controverted by the petitioner, and for the purposes of this appeal must be assumed to be true.

Having seen that the action of the respondent under the authority of the board of education, in excluding the relator from the school for white children, was justified by the statute of this State, it remains only to inquire whether such statutes have been repealed by the legislature, or annulled by the paramount authority of the Constitution of the United States. It is claimed by the counsel for the relator that these statutes have been abrogated by the adoption of the fourteenth amendment to the Federal Constitution, which took effect in July, 1868. The determination of this appeal depends mainly upon the effect to be given to the provisions of this amendment. It reads as follows: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." On the 20th day of March, 1870, a further amendment to the Federal Constitution was adopted, which provided that "the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color or previous condition of servitude."

The argument of the appellant's counsel is to the effect that the fourteenth amendment, under the laws of this State, giving equal privileges in its common schools to every citizen, confers upon the relator not only the right of equal educa-

tional facilities with white children, but that such education shall be furnished at the same time and place with that afforded to any other child, otherwise it is claimed that she is abridged of some " privilege or immunity " which of right belongs to her, or that she is denied the equal protection of the law.

The history of this amendment is familiar to all, and for all of the purposes of this argument may be briefly summarized. At the time of its adoption the colored race had been recently emancipated from a condition of servitude and made citizens of the States. It was apprehended that in some, if not all, of the States of the Union, feelings of antipathy between the races would cause the dominant race, by unfriendly legislation, to abridge the rights of the other, and deny to them equal privileges and the protection of the laws. To guard the previously subject race from the effect of such discrimination, these provisions are made a part of the fundamental law of the land, and their rights were placed under the protection of the Federal government. Their object has been defined by Mr. Justice STRONG in *Ex parte Virginia* (100 U. S. 344), where it is said that " one great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude, in which most of them had previously stood, into perfect equality of *civil rights* with all other persons within the jurisdiction of the States." The same learned judge in *Strauder* v. *West Virginia* (100 U. S. 306), also says : " It was designed to assure to the colored race the enjoyment of all of the *civil rights* that, under the law, are enjoyed by white persons, and to give that race the protection of the general government, in that enjoyment, when it should be denied by the States."

It will be observed that the language of the amendment is peculiar in respect to the rights which the State is forbidden to abridge. Although the same section makes all persons born or naturalized in the United States, and subject to the jurisdiction thereof, citizens of the United States and of the State wherein they reside, yet, in speaking of the class of privileges and immunities which the State is forbidden to deny the citizen,

they are referred to as the privileges and immunities which belong to them as citizens of the United States. It has been argued from this language that such rights and privileges as are granted to its citizens, and depend solely upon the laws of the State for their origin and support, are not within the constitutional inhibition and may lawfully be denied to any class or race by the States at their will and discretion. This construction is distinctly and plainly held in *The Slaughter-House Cases* (16 Wall. 36), by the Supreme Court of the United States. The doctrine of that case has not, to our knowledge, been retracted or questioned by any of its subsequent decisions.

It would seem to be a plain deduction from the rule in that case that the privilege of receiving an education at the expense of the State, being created and conferred solely by the laws of the State, and always subject to its discretionary regulation might be granted or refused to any individual or class at the pleasure of the State. This view of the question is also taken in *State, ex rel. Garnes*, v. *McCann* (21 Ohio St. 210), and *Cory v. Carter* (48 Ind. 337; 17 Am. Rep. 738). The judgment appealed from might, therefore, very well be affirmed upon the authority of these cases.

But we are of the opinion that our decision can also be sustained upon another ground, and one which will be equally satisfactory as affording a practical solution of the questions involved. It is believed that this provision will be given its full scope and effect when it is so construed as to secure to all citizens, wherever domiciled, equal protection under the laws and the enjoyment of those privileges which belong, as of right, to each individual citizen. This right, as affected by the questions in this case in its fullest sense, is the privilege of obtaining an education under the same advantages and with equal facilities for its acquisition with those enjoyed by any other individual. It is not believed that these provisions were intended to regulate or interfere with the social standing or privileges of the citizen, or to have any other effect than to give to all, without respect to color, age or sex, the same legal rights and the uniform protection of the same laws.

In the nature of things there must be many social distinctions and privileges remaining unregulated by law and left within the control of the individual citizens, as being beyond the reach of the legislative functions of government to organize or control. The attempt to enforce social intimacy and intercourse between the races, by legal enactments, would probably tend only to embitter the prejudices, if any such there are, which exist between them, and produce an evil instead of a good result. (*Roberts* v. *City of Boston*, 5 Cush. 198.)

As to whether such intercourse shall ever occur must eventually depend upon the operation of natural laws and the merits of individuals, and can exist and be enjoyed only by the voluntary consent of the persons between whom such relations may arise, but this end can neither be accomplished nor promoted by laws which conflict with the general sentiment of the community upon whom they are designed to operate. When the government, therefore, has secured to each of its citizens equal rights before the law and equal opportunities for improvement and progress, it has accomplished the end for which it is organized and performed all of the functions respecting social advantages with which it is endowed.

The design of the common school system of this State is to instruct the citizen, and where, for this purpose, they have placed within his reach equal means of acquiring an education with other persons, they have discharged their duty to him and he has received all that he is entitled to ask of the government with respect to such privileges. The question as to how far he will avail himself of those advantages, or having done so, the use which he will make of his acquirements, must necessarily be left to the action of the individual.

The claim which is now made, that any distinction made by law and founded upon difference of race or color is prohibited by the Constitution, leads to startling results and is not believed to be well-founded. While the occasion of the enactment of the constitutional amendments was such as we have referred to, its language embraces and is addressed to all classes alike, and if susceptible of the construction attempted to be

placed upon it, must inhibit any enactment by the State which classifies the citizens and authorizes associations to be sustained, in whole or in part, by public bounty for the benefit of any special class. (*The Slaughter-House Cases, supra.*) When the large number of such institutions organized, not only in this but in other States of the Union, for the exclusive use and benefit of the colored race, and which have effected much for its improvement and advantage is considered, it is believed that no sincere friend of that people could desire to raise the questions involved in this appeal, or wish any other result than that which should sustain them in the enjoyment of those institutions specially organized for their benefit and advantage.

It would seem to follow, as the necessary result of the appellant's contention, that the action of the legislatures of the various States providing schools, asylums, hospitals and benevolent institutions for the exclusive benefit of the colored as well as other races, must be deemed to be infractions of constitutional provisions and unlawful exercise, of legislative power. The literal application of its provisions as interpreted by him would prevent any classification of citizens for any purpose whatever under the laws of the State, and subvert all such associations as are limited in their enjoyment to classes distinguished either by sex, race, nationality or creed. If the argument should be followed out to its legitimate conclusion, it would also forbid all classification of the pupils in public schools founded upon distinctions of sex, nationality or race, and which, it must be conceded, are essential to the most advantageous administration of educational facilities in such schools. Seeing the force of these contentions the appellant concedes that discrimination may be exercised by the school authorities with respect to age, sex, intellectual acquirements and territorial location, but he claims that this cannot, under the Constitution, be extended to distinctions founded upon difference in color or race. We think the concession fatal to his argument.

The language of the amendment is broad, and prohibits every discrimination between citizens as to those rights which

are placed under its protection. If the right, therefore, of school authorities to discriminate, in the exercise of their discretion, as to the methods of education to be pursued with different classes of pupils be conceded, how can it be argued that they have not the power, in the best interests of education, to cause different races and nationalities, whose requirements are manifestly different, to be educated in separate places. We cannot see why the establishment of separate institutions for the education and benefit of different races should be held any more to imply the inferiority of one race than that of the other, and no ground for such an implication exists in the act of discrimination itself. If it could be shown that the accommodations afforded to one race were inferior to those enjoyed by another, some advance might be made in the argument, but until that is established, no basis is laid for a claim that the privileges of the respective races are not equal. Institutions of this kind are founded every day in the different States under the law for the exclusive benefit of particular races and classes of citizens, and are generally regarded as favors to the races designated instead of marks of inferiority.

A natural distinction exists between these races which was not created neither can it be abrogated by law, and legislation which recognizes this distinction and provides for the peculiar wants or conditions of the particular race can in no just sense be called a discrimination against such race or an abridgment of its civil rights. The implication that the Congress of 1864, and the State legislature of the same year, sitting during the very throes of our civil war, who were respectively the authors of legislation providing for the separate education of the two races, were thereby guilty of unfriendly discrimination against the colored race, will be received with surprise by most people and with conviction by none. Recent movements on the part of the colored people of the south, through their most intelligent leaders, to secure Federal sanction to the separation of the two races, so far as the same is compatible with their joint occupation of the same geographical territory, afford strong evidence of the wishes and opinions of that people as to the

methods which in their judgments will conduce most beneficially to their welfare and improvement.

This appeal has been argued by the appellant upon the assumption that the colored children have been excluded from something to which white children are admitted. This assumption is, we think, erroneous. The case shows that they have been afforded in all respects the same rights and the same advantages that have been awarded to the whites, and there is no more foundation for the claim that they have been excluded from the public schools of Brooklyn than there is for a claim that the pupils of one district, who are confined in their attendance to the district in which they reside, are excluded from its schools, or that the female pupils are excluded from equal privileges, because of their exclusion from male schools, on account of the regulations which require the separate education of the two sexes.

The right of the individual, as affected by the question in hand, is to secure equal advantages in obtaining an education at the public expense, and where that privilege is afforded him by the school authorities, he cannot justly claim that his educational privileges have been abridged, although such privileges are not accorded him at the precise place where he most desires to receive them. It was quite pertinently said by the court in *Cory* v. *Carter* (48 Ind. 363 ; 17 Am. Rep. 738) : "In our opinion, there would be as much lawful reason for complaint by one scholar in the same school that he could not occupy the seat of another scholar therein at the same time the latter occupied it, or by scholars in the different classes in the same school that they were not all put in the same class, or by the scholars in the different schools that they were not all placed in one class, as there is that white and black children are placed in distinct classes and taught separately or in separate schools."

The fact that by this system of classification one person is required to go further to reach his place of instruction than he otherwise would is a mere incident to any classification of the pupils in the public schools of a large city, and affords no substantial ground of complaint.

It is quite impracticable for the authorities to take into
account and provide for the gratification of the taste, or even
the convenience of the individual citizen in respect to the place
or conditions under which he shall receive an education. In the
nature of things one pupil must always travel further to reach
a fixed place of instruction than another, and so too the resi-
dent of one district is frequently required to go further
to reach the school established in his own district than a school
in an adjoining district, but these are inconveniences incident
to any system, and cannot be avoided. It is only when he can
show that he is deprived of some substantial right which
is accorded to other citizens and denied to him that he can suc-
cessfully claim that his legal rights have been invaded.

The highest authority for the interpretation of this amend-
ment is afforded by the action of those sessions of Congress
which not only immediately preceded, but were also contem-
poraneous with, the adoption of the amendment in question.

Exclusive schools for the education of the colored race were
originally established in the District of Columbia, by Congress
in 1862, since which time that body has, by repeated amend-
ments to the original act, sanctioned and approved not only
the constitutionality of such legislation, but also the policy of
such a system of education. (Chap. 151, Laws of Congress
1862; chap. 83, same 1863; chap. 156, same 1864; chap. 217,
same 1866; chap. 308, same 1873.) The following provision,
which constitutes section 16 of chapter 156 of the Laws of
1864, is specially significant: "That any white resident of said
county shall be privileged to place his or her child, or ward, at
any one of the schools provided for the education of white
children in said county, he or she may think proper to select,
with the consent of the trustees of both districts, and any
colored resident shall have the same rights with respect to
colored schools." As far as we have been able to discover, this
provision still remains in force, and is the law of the District
of Columbia.

The thirty-ninth Congress, which originated and adopted the
amendment in question, not only made appropriations and

1883.]    PEOPLE, ex rel. KING, v. GALLAGHER.    453

Opinion of the Court, per RUGER, Ch. J.

assigned funds for the support of schools in the District of Columbia, established for the education of colored pupils exclusively (Chap. 217, Laws of U. S., passed July 23, 1866), but they also appropriated moneys for the support of an institution established therein for the exclusive benefit of destitute colored women and children.

If regard be had to that established rule for the construction of statutes and constitutional enactments which require courts, in giving them effect, to regard the intent of the law-making power, it is difficult to see why the considerations suggested are not controlling upon the question under discussion.

The question here presented has also been the subject of much discussion and consideration in the courts of the various States of the Union, and it is believed has been, when directly adjudicated upon, uniformly determined in favor of the proposition that the separate education of the white and colored races is no abridgment of the rights of either.

As early as 1849 the subject, under circumstances precisely similar to those existing in this case, was considered by the Supreme Court of Massachusetts in the case of *Roberts* v. *City of Boston* (5 Cush. 198), and the court, Chief Justice SHAW writing, say: " Conceding, therefore, in the fullest manner, that colored persons, the descendants of Africans, are entitled by law in this Commonwealth to equal rights, constitutional and political, civil and social, the question then arises whether the regulation in question which provides separate schools for colored children is a violation of any of their rights." And they there held that it was not, and they further say: " The law has vested the power in the committee to regulate the system of distribution and classification, and where this power is reasonably exercised, without being abused or perverted by colorable pretenses, the decision of the committee must be deemed conclusive. The committee, apparently upon great deliberation, have come to the conclusion that the good of both classes of schools will be best promoted by maintaining the separate primary schools for colored and for white children, and we can perceive no ground to doubt that this is the honest re-

sult of their experience and judgment." The Supreme Court of Ohio, in the case of *State, ex rel. Garnes*, v. *McCann (supra)*, had before them the effect of the constitutional amendment in a case precisely similar to the one at bar, and held by the unanimous opinion of all of the members of that court, that the establishment of separate schools for the education of colored children, and their exclusion from the schools designed for whites alone did not constitute a violation of the rights of colored persons under the Constitution.

The following cases arising in different States may be referred to as supporting the same doctrine: *Cory* v. *Carter* (48 Ind. 327; 17 Am. Rep. 738); *People, ex rel. Dietz*, v. *Easton* (13 Abb. Pr. [N. S.] 159); *Ward* v. *Flood* (17 Am. Rep. 405); *Dallas* v. *Fosdick* (40 How. 249); *State, ex rel. Stoutmeyer*, v. *Duffy* (8 Am. Rep. 713). These cases show quite a uniform current of authority in favor of that interpretation of the constitutional amendment which we have given to it. We have given careful examination to the various cases cited by the appellant's counsel in support of his argument, and are of the opinion that none of them conflict with the conclusions at which we have arrived. The following cases cited by him arose under statutes which either expressly forbid or did not authorize the school authorities to separate the races and assign them to different places for instruction: *Board of Education* v. *Tinnon* (26 Kans. 1); *Clark* v. *Board of Directors, etc.* (24 Iowa, 266); *Smith* v. *Directors, etc.* (40 id. 518); *Dove* v. *Ind. School Dist.* (41 id. 689); *People, ex rel. Longress*, v. *Board of Education* (101 Ill. 308; 40 Am. Rep. 196); *People* v. *Board of Education* (18 Mich. 400).

The following cases also cited by the appellant are distinguishable from this as arising under the laws of the several States or districts where rendered, which absolutely prohibited the particular act complained of. They did not involve the construction of the constitutional amendments, or the rights of colored persons arising thereunder. *Central Railroad Co.* v. *Green* (86 Penn. St. 421; 27 Am. Rep. 718); *Decuir* v. *Benson* (27 La. Ann. 1); *Donnell* v. *State* (48 Miss. 680; 12 Am. Rep. 375); *Coger* v. *N. W. Union Packet Co.* (37 Iowa, 145).

1883.]     PEOPLE, ex rel. KING, v. GALLAGHER.          455

Opinion of the Court, per RUGER, Ch. J.

In the case of *Railroad Co.* v. *Brown* (17 Wall. 446), the question arose under a statute which forbid a railroad company from excluding any person " from the cars on account of color." The court construed the act according to their understanding of the intent of Congress in passing the statute, and held that colored people could not be excluded from any car on account of their color. The case of *Strauder* v. *West Virginia* (100 U. S. 303) is strongly pressed upon our attention as an authority by the appellant. We do not consider it to be so. In that case a colored man was placed upon trial for murder, under the laws of a State which excluded colored persons, however competent, from serving as jurors in its courts. It was held that this law discriminated against the colored race, and deprived them of the right of being tried before a jury composed in part at least of persons of their own race, and which right was enjoyed by their white fellow citizens. It was rightly held that this statute denied them the equal protection of the law, and was a violation of the constitutional amendment. We can see no analogy between these cases.

Having thus attempted to show that principle and authority both concur in the conclusions which we have reached, in regard to the questions presented on this appeal, it only remains to refer to one or two other suggestions bearing less directly upon the questions presented, which have been made for our consideration.

The argument of the appellant's counsel, which is founded upon that clause of the constitutional amendment granting to every citizen the equal protection of the law, must fall with his main argument as being founded upon the unwarranted assumption that this protection has been denied to the relator in this case. Equality and not identity of privileges and rights is what is guaranteed to the citizen, and this we have seen the relator enjoy. So also the claim made that the laws of this State authorizing the establishment of colored schools were repealed by the Civil Rights Act (Chap. 186, Laws of 1873) is not well founded. It is not pretended that there has ever been any express repeal of these laws by the act in question, but it

456 · PEOPLE, ex rel. KING, v. GALLAGHER. [Oct.,

Opinion of the Court, per RUGER, Ch. J.

is claimed that such school laws containing discrimination against the colored race are impliedly repealed by its enactment.

We are thus invited to hold the school laws repealed by implication, a method frequently condemned, and never favored by the courts.

It is difficult to see how there is any inconsistency even between these several laws. The act of 1873 provides that colored persons shall have "full and equal enjoyment of any accommodation, advantage, facility or privilege furnished" by the school authorities to other citizens. By another section the use of any term in a statute which discriminates *against* persons of color is repealed and annulled. This statute provides only for equal facilities and advantages for the colored race, and these we have seen the relator under the general school laws of the State enjoys. It also condemns the use of any term in a statute which discriminates *against* colored people. We have attempted to show that the establishment of separate institutions for their education and support was not a discrimination against them.

It will be observed that the statutes nowhere require the school authorities to establish separate schools for the exclusive use of the two races, but they leave that subject to the discretion of such authorities.

Suppose actual experience had demonstrated that on account of the discomforts and annoyances to which a minority are ever subjected on account of race prejudices, the joint education of the two races was detrimental to the interests of one of them, or the wishes of the colored race in favor of separate places of education had been conclusively expressed, would it not be a just and reasonable exercise of the discretion of the school authorities to establish separate schools in such places? and could it in any sense be said, in case that was done, that either race was discriminated against by such exercise of discretion? We think not. It is undoubtedly true that in many localities in this State the school authorities have not availed themselves of their authority to cause separate places of education to be established for the respective races. And

in those places the joint education of the races has been carried on. This fact seems to show that this question may safely and fairly be left to their discretion, and in time, where that course may be deemed best, it will be voluntarily adopted by such authorities. Certainly this court cannot determine, as a question of law, that there are not localities in the State in which, under the peculiar animosities affecting that locality the establishment of separate schools for the education of the colored race may not be the wisest and most beneficent exercise of discretion in their favor. The statutes of the State have left that question entirely to the school authorities, and we think have wisely done so. We cannot review the exercise by them of that discretion in any particular instance and determine that they have mistakenly or imprudently discharged the duty which the law has cast upon them.

It is not discrimination between the two races which is prohibited by law, but discrimination against the interests of the colored race. We cannot conceive it to be possible that it can be successfully maintained that in the establishment of schools, asylums, hospitals and charitable institutions for the exclusive enjoyment of particular races or classes, that the founders thereof are justly subject to the imputation of unfriendly conduct toward the class for whom such institutions are designed.

The same legislature which enacted the so-called Civil Rights Bill also reinvested the school authorities of Brooklyn with the power conferred by the previously existing statutes relating to the establishment of colored schools in that city, and it can hardly be implied that they intended by this act to repeal statutes which were immediately thereafter referred to by them as still existing laws.

We have thus, without considering the question as to whether the right to the writ of *mandamus* might not have been within the discretion of the court of original jurisdiction, and therefore unappealable, and the further question as to whether the respondent was the proper person to whom it should be addressed, arrived at the conclusion upon the merits, that the order should be affirmed.

DANFORTH, J. (dissenting). I cannot concur in sustaining the judgment appealed from. In my opinion the relator brings her case within the spirit, the intention and the meaning of the fourteenth amendment of the Constitution of the United States, as she also does within the letter of chapter 186 of the Laws of this State, enacted in 1873, entitled "An act to provide for the protection of citizens in their civil and public rights." It seems to be settled by repeated decisions of the Federal courts that the object of the amendment was not only to give citizenship to colored persons, but by preventing legislation against them distinctly as colored, or on the ground of color, secure exemption against any discrimination which either implies legal inferiority in civil society or lessens the security of their rights, and which, if permitted, would, in the end, subject them while citizens to the degrading condition of an enslaved race. (*Strauder* v. *West Virginia*, 100 U. S. 303; *County of San Mateo* v. *Southern Pacific R. Co.*, 13 Federal Reporter, 722; *Ex parte Virginia*, 100 U. S. 339; *Neal* v. *Delaware*, 103 id. 370; *Virginia* v. *Rives*, 100 id. 313; *United States* v. *Reese*, 92 id. 214.) This amendment became part of the fundamental law in the year 1868, and the statute of this State (*supra*) was passed to carry that object into effect. The first (fourteenth amendment) declares that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, * * * nor deny to any person within its jurisdiction the equal protection of the laws." And it can make no difference in its application whether the regulation which produces that effect is embodied in a law coming directly from the legislature, or is found in an ordinance, or rule, or direction emanating from an officer whose authority to act at all in the matter is derived from the legislature. (*Ex parte Virginia, supra; Neal* v. *Delaware, supra.*)

The statute, however, with more detail and directness, so far as the case in hand is concerned, declares (§ 3) that discrimination against any citizen on account of color, by the use of the word "white," or any other term in any law, statute, ordi-

nance or regulation then existing in this State, shall be annulled, and secured immunity to him in the future by providing that no citizen should, "by reason of race, color or previous condition of servitude, be excepted or excluded from the full and equal enjoyment of any accommodation, advantage, facility or privilege furnished by," among others, * * * "trustees, commissioners, superintendents, teachers and other officers of common schools and public institutions of learning." It is unnecessary to spend time in discussing the effect of the amendment as determined by any distinction between citizens of the United States and citizens of the States, or their civil rights in those two characters. For, so far as the relator is interested in the present question as a citizen of the State, and within its limits, she may rely on this law of the State. (*Supra.*) By it the doctrine under which the African race was regarded as of a rank or condition inferior to that of the white was abolished, and we are to see whether the action of the respondent was in violation of the law by which this change was brought about.

It is conceded that the appellant was forbidden to enter school No. 5 because of her color, and she was directed to go to school No. 1, because it was a "colored school." The inquiry, then, was as to the color of the proposed pupil, and the action of the respondent was determined solely by it. I am unable to see why this regulation does not stand upon "a word or term," which, by the very language of the act cited, was forbidden to be used as the means of discrimination. It is as if the respondent had said "white children only can attend this school; you are not white." Was not the relator "excepted or excluded" from the accommodation or privilege afforded by that school by reason only of her "race or color"? Clearly she was. It is argued by the respondent, however, that this does not constitute a discrimination against the relator, because the colored school would, "to the best of his judgment, information and belief, afford to the relator" every accommodation and facility for learning which she could obtain at the one from which she was excluded.

460　PEOPLE, ex rel. KING, v. GALLAGHER.　[Oct.,

Dissenting opinion, per DANFORTH, J.

I find no support for this in the law. It is not provided
that the colored pupil shall have furnished to her equal or
similar accommodations as the white pupil, but that she shall
not be excluded from any accommodation, advantage, facility
or privilege furnished by the officers of common schools; she
shall, therefore, have the same, and be denied those schools for
no reason save such as would exclude the children of another
race. In other words, difference of color of skin, or variety
of race shall, as to the accommodations or privileges spoken of
in the statute, be deemed not to exist, at least, that the school
officer in his official capacity shall be so ignorant of their ex-
istence as to take no notice of either, and when he does, and,
therefore, excludes from any school a person who, except for
such color or race, would be received therein, the discrimina-
tion is against that person; the door is shut against her, and
that is proscription. In *Ex parte Virginia* (100 U. S.
339) and *Strauder* v. *West Virginia* (id. 303) it is in substance
said that one great purpose of the then recent amendments to
the Constitution was to remove the colored race from a con-
dition of inferiority and servitude into perfect equality of civil
rights with all other persons within the jurisdiction of the
States; that they were intended to take away all possibility of
oppression by law because of race or color, and amounted to a
declaration that the law should be the same for the black as for
the white. Our own statute is more specific, but both were
designed to release that race from any disability or restraint to
which the other was not subjected; and make their rights and
responsibilities the same. One cannot, on account of color, be
excepted from jury lists (*Ex parte Virginia, supra ; Strauder*
v. *West Virginia, supra*), and a statute which effects that is
said to put "a brand upon him, and create a discrimination
against him, which is forbidden." *Strauder's Case (supra)*,
*Railroad Co.* v. *Brown* (17 Wall. [U. S.] 445) was under a
law of Congress giving privileges to a railroad company, ac-
companied with a provision " that no person shall be excluded
from the cars on account of color." The company provided
two cars, but set apart one for colored persons and the

other for white, and such was the arrangement that on the down and up trips their places were reversed. The cars, therefore, were alike comfortable, and in turn appropriated to the two races, but separately. A colored woman being excluded from one, and sent against her will to that assigned to her race, brought suit against the company, and succeeded, the court holding that the regulation separating the colored from the white passengers was illegal, and in answer to the defendant's claim that so far from excluding this class of persons from the cars they had provided accommodations for them, said "this is an ingenious attempt to evade a compliance with the obvious meaning of the requirement," which was not merely that colored people should be allowed to ride, but that in the use of the cars there should be no discrimination because of their color.

The principle of these decisions applies here. In one case, as in the other, is discrimination on account of color. The fatal defect is in the fact of discrimination and its cause. To this effect is *Central R. R. of N. J.* v. *Green* (86 Penn. St. 421; 27 Am. Rep. 718); and more in point, *Board of Education* v. *Tinnon* (26 Kans. 1) and *People, ex rel. Longress,* v. *Board of Education* (101 Ill. 308; 40 Am. Rep. 196).

The respondent has referred to a number of cases as holding a different doctrine: *People, ex rel. Dietz,* v. *Easton* (13 Abb. Pr. [N. S.] 159); *Dallas* v. *Fosdick* (40 How. Pr. 249), and some from other States. They have been examined, but found insufficient, upon the facts and statutes before us, to sustain the doctrine contended for by him. *People, ex rel. Dietz,* v. *Easton* and *Dallas* v. *Fosdick* (*supra*) were both decided before the passage of the Civil Rights Act of 1873 (*supra*). The first was at Special Term and the latter at General Term by a divided court, one judge dissenting and another taking no part. The last decision being put upon a law relating to the city of Buffalo, which imperatively required separate schools for black children to be provided and their attendance limited thereto. By that law (1853, chap. 230), the public schools of Buffalo were free only to "white children" (Title 6, § 5). The other (*People, ex rel. Dietz,* v. *Easton*)

arose in the city of Albany. The whole city was one school district. There was no school, therefore, with which any child had any special connection, and the board of education exercised over the relator in that case the same jurisdiction which determined the location of other scholars, and upon this ground the claim of the relator to be sent to the school nearest his residence was denied. The question of color came incidentally before the court, and the effect of the fourteenth amendment was discussed, but not necessarily, nor does the decision turn upon it. *Roberts* v. *City of Boston* (5 Cush. 198) was decided in 1849, before the adoption of the fourteenth amendment, and does uphold to the furthest extent the right of a municipality to compel the education of colored children in schools apart from white children; but those schools have been discontinued under the operation of a law passed by that Commonwealth in 1855, which provided that in determining the qualifications of scholars to be admitted into any public school or any district school, " no distinction shall be made on account of the race, color or religious opinions of the applicant or scholar."

If the respondent is right, then with equal plausibility it might be said that the city of Brooklyn could provide parks, streets and sidewalks exclusively for persons of color, or, if elected, as they may be, to sit in its council chamber, prescribe absolutely what seats they shall occupy, or its courts assign to the jurymen of that race, boxes separate from others, denying them access to other streets, parks, sidewalks and seats. It would not answer in either case to say all these things are equal or even better in degree than those. This would still be discrimination against the race, and so with the school, the main business of which is to prepare a youth for his future duties as a citizen in his various relations toward the State, the performance of obligations due to other citizens, and possibly even forbearance and conduct toward opposing races.

The State gathers to its treasury the money of the tax payer without inquiry as to his color ; — with like indifference accepts his vote, and subjects him to its laws, and in return, among other privileges, provides an opportunity for education. This

being conceded, the manner of adjusting it is evidently the one prescribed by the State itself — schools free to all children, therefore to children of both races, upon conditions applicable to each alike. No other can be relied upon. The application of the rule contended for by the respondent would vary according to the conceit or bias of the school board, and the estimate they might put upon the relative positions of the two races; the needs of the colored pupil and required capacity of her teacher. There is also the general law of the State declaring all common schools (and that in question is one of them) free to all persons over five and under twenty-one years of age, residing in the district (Act of 1851, chap. 151, § 1; act of 1864, chap. 555, title 7, art. 5, § 39), and these schools were necessarily open to colored as well as white children. It is contended, however, by the respondent that the statute last cited (Title 10, §§ 1, 2), and the statute of 1850 (Chap. 143, § 4) gave to the board of education power to establish separate schools for colored children. Conceding that to be so, it does not follow that they should or can be excluded from others. Different language would naturally be employed to express such a purpose.

The first act, that of 1864 (*supra*, art. 5, § 39), provides that "Common schools in the several school districts of this State shall be free to all persons over five and under twenty-one years of age, residing in the district," but section 40 declares that if a school district include a portion of an Indian reservation whereon a school for Indian children has been established by the superintendent of public instruction, and is taught, the school of the district is not free to Indian children resident in the district, or on the reservation, nor shall they be admitted to such school except by the permission of the superintendent." It is apparent, first, that the education of all children within the ages named is intended to be provided for; second, that separate schools may be established for Indians and separate schools for colored children; and third, I think it clear from the different phraseology used by the legislature in reference to these races that a colored child might attend either a

colored school or white school at his election. In regard to him there are no words of prohibition as in the case of the Indian, and, except for those words of prohibition, it was the evident understanding of the legislature, an Indian could attend either. The white school remained free to the colored pupil, but was closed against the Indian, except by permission of the superintendent of public instruction.

And so with the legislation under review by the Supreme Court in *Dallas* v. *Fosdick* (*supra*). The language in terms excludes colored children. Such language is not to be found within the limits of the statutes relating to Brooklyn. But we have now the act of 1873 (Chap. 186 already cited), which permits no doubt as to the present absolute right of each child not disqualified by some mental or moral defect, to attend the common school established in the district where he resides. Previous limitation on account of color, if any existed, necessarily ceased with the enactment of this act (1873, *supra*). Nor did the subsequent statute of June, 1873 (Chap. 863), amending the charter of Brooklyn, or the act (Chap. 420) of the same year, relating to the board of education, have the effect to repeal as to that city the Civil Rights Act already cited (Chap. 186, Laws of 1873). An express repeal is not pretended, and there is nothing in the act from which a repeal can be implied. The two acts have different objects; the first (that of April, 1873, *supra*) is defined by its title and was aimed at the protection of the citizen, while the other (that of June, chaps. 420, 803) as part of the general charter of the city, created a department of public instruction, to be under the control of a board of education, to which it declares "all the provisions of law relating to the present board of education shall apply," and if I am right in the foregoing discussion, then among others, the provisions of the act just before passed (Chap. 186).

It is not long since the inferiority of the colored man was received by a great majority of the white race as a general edict of nature, and upon it as a fundamental principle laws were passed, and regulations, usage and custom founded. In deference to it, and the general sentiment of antipathy to the

negro race, "colored schools" were authorized by the statutes referred to, and then certain schools before free to all were open only to the white citizen. By the act of 1873 (Chap. 186) the "word or term" which was thought to permit this discrimination was annulled, and thenceforward it became impossible. Neither the wisdom nor justice of this course of legislation is now in question, nor are we to inquire whether co-education of the races is desirable, or more or less likely than the separate system to promote the welfare of either, but it cannot, I think, be doubted that the latter, when enforced by law against the wish of the colored race, is directly calculated to keep alive the prejudice against color from which sprung many of the evils for the suppression of which the fourteenth amendment and our own civil rights statute were enacted.

We find, however, in the opinion of the learned judge who disposed of this case at Special Term, a suggestion that the discrimination was in favor of the colored child. That question may well be left to the child itself. The statute should not be construed as prohibiting such intercourse or association. For any regulation by which the black is kept in a state of separation is in fact one of exclusion and reflects the sentiment by which the white assumed to be the superior race, a discrimination against which the law is now directly aimed. In regard to schools the question can arise but seldom. In most of the counties and cities of this State no provision is made for the separate education of colored children. In a few counties, and in the city of New York as well as Brooklyn, such accommodations are provided. But when they are not confined to those schools and excluded from others, the attendance at them has steadily decreased, as we learn from the reports of the board of education of the city of New York, made under the direction of the legislature (Laws of 1851, chap. 386, § 3, subd. 10), and that this diminished attendance is due to the fact that all its public schools are now open to pupils without distinction of race or color, and "that many parents and guardians of colored children have, therefore, availed themselves of the privilege in

the matter of selection of schools." (See reports of 1881 and 1882.)

From the report of 1880, made by the board of education of the city of Buffalo, we find the same condition exists in that city. Colored children now attend the other schools with such unanimity that the superintendent recommends, that by legislative interference, the compulsory part of the law be repealed and the city no longer required to provide separate schools for children who cannot be compelled to resort to them.

In the case before us the city is under no obligation to maintain a separate school for children of color. But the objection is not to its existence; the objection is that the relator is compelled to attend it because of her color, and so is excluded from schools to which children of another race are permitted to resort. The exaction is, therefore, unequal, and is, I think, in violation of the law which gives to all children, within the several districts, an equal right, in like cases and under like circumstances, to go to those schools for education. I am, therefore, led to the conclusion that the relator, on account of her color, has been prevented, by a public officer and by ordinance or regulation, from enjoying an accommodation or privilege to which, as a citizen of this State, she is entitled. In such a case the court has no discretion to exercise, for the writ of *mandamus* affords the only adequate remedy, and it should have been granted. (*People, ex rel. Gas-light Co.,* v. *Common Council of Syracuse,* 78 N. Y. 56.)

The orders of the Special and General Terms should, therefore, be reversed, and a writ issued, pursuant to the prayer of the petitioner.

RAPALLO, MILLER and EARL, JJ., concur with RUGER, Ch. J.; FINCH, J., concurs with DANFORTH, J.; ANDREWS, J., absent.

Orders affirmed.