(44 App. Div. 469.)

PEOPLE ex rel. CISCO v. SCHOOL BOARD OF BOROUGH OF QUEENS, NEW YORK CITY.

(Supreme Court, Appellate Division, Second Department. November 21, 1899.)

PUBLIC SCHOOLS—ADMISSION OF COLORED CHILDREN.
    Consolidated School Law (2 Rev. St. [9th Ed.] p. 1606) tit. 15, § 28, authorizing a city to establish separate schools for colored children, to be supported in the same manner and to the same extent as the schools for white children, and to be furnished equal facilities for instruction, is not inconsistent with Const. art. 9, § 1, declaring that the legislature shall provide for "a system of free common schools, wherein all the children of this state may be educated."

Appeal from special term, Suffolk county.

Mandamus proceedings, on the relation of Elizabeth Cisco, against the school board of the borough of Queens, New York City. From an order denying a peremptory writ, relator appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

George Wallace, for appellant.
William J. Carr, for respondent.

GOODRICH, P. J. The relator, Mrs. Cisco, is a colored woman, the mother of several children, and resides in the Fourth ward of the borough of Queens. She applied to the special term for a peremptory writ of mandamus directing the school board of the borough of Queens to admit her children to the common or public schools, and to make no distinction in the case on account of their color. Her moving affidavits show that her children are entitled to admission to the common schools of the borough in the former village of Jamaica, which is now all embraced in one school district; that she applied to the principal of a primary school known as the "Brenton Avenue School" to admit her children to that school; that she was directed to apply to the High School, of which Mr. Jennings was

principal, having charge of the admission of children to the several schools; that he refused to admit the children to the Brenton Avenue School, on the ground that Supt. Stevens had directed that colored children should not be admitted to what are called "white schools"; and that Mr. Jennings said he would assign them to school No. 48, which is a separate school for colored children. The return shows that, at the time of Mrs. Cisco's application for the admission of her children, school 48 was in all respects equipped like other schools, with teachers of equal ability, and was conducted as a school for all grades up to and including the sixth grade, as specified in the course of study adopted by the school board of the borough of Queens, and that when pupils had passed through that grade they were assigned to the seventh grade in the Central Grammar School, No. 47, and, upon graduation therefrom, to the High School, which is a department of school 47. The relator has stipulated that she does not controvert these facts as to the organization of the separate school and the qualification of the teachers, and "rests her case solely on the fact that her children were refused admission to the common school on account of their color." We are thus brought to the simple question whether, under the provisions of the consolidated school law (2 Rev. St. [9th Ed.] p. 1497), a colored child can be refused admittance to the so-called "white public schools" wherever separate schools of equal grade have been provided within the district for colored children.

Section 28 (title 15) of the consolidated school law is a re-enactment, in exact words, of section 1 of title 10 of an act to revise and consolidate the general acts relative to public instruction, chapter 555 of the Laws of 1864, known as the "Common School Act." It reads as follows:

"Sec. 28. The school authorities of any city or incorporated village, the schools of which are or shall be organized under title eight (formerly nine) of this act, or under special act, may, when they shall deem it expedient, establish a separate school or separate schools for the instruction of children and youth of African descent, resident therein, and over five and under twenty-one years of age; and such school or schools shall be supported in the same manner and to the same extent as the school or schools supported therein for white children, and they shall be subject to the same rules and regulations, and be furnished with facilities for instruction equal to those furnished to the white schools therein."

This section of the act of 1864 was under consideration by the court of appeals in the case of People v. Gallagher, 93 N. Y. 438, and was held to be valid and constitutional. The court decided that the school authorities have power, when in their opinion the interests of education will be promoted thereby, to establish schools for the exclusive education of colored children, and that when such schools are established, and provided with equal facilities for education, colored children may be excluded from the schools provided for the white children. It is not decorous for this court to analyze the reasons of the court of appeals for that decision, which remains the law of this state. But the learned counsel for the appellant contends that the authority of that case has been shaken by the subsequent opinion of that court in People v. King, 110 N. Y. 418, 18 N. E. 245,

1 L. R. A. 293, a case which related to the exclusion of a colored man
from a skating rink or place of public amusement, under section 383
of the Penal Code, which reads as follows:

"Sec. 383. A person who: 1. Excludes a citizen of this state, by reason of
race, color or previous condition of servitude, from the equal enjoyment of
any accommodation, facility or privilege furnished by innkeepers or common
carriers, or by owners, managers, or lessees of theatres or other places of
amusement, or by teachers and officers of common schools and public institu-
tions of learning, or by cemetery associations; or   *   *   *   is guilty of a
misdemeanor.   *   *   *"

This case of People v. King furnishes no analogy to the case at
bar. The entertainment offered in one of such places is not equiva-
lent to that offered in another. No person may be denied admis-
sion to any one of such places which he may prefer to select. Places
of public amusement are for the furnishing of particular entertain-
ment. Each differs from all others. Each is sui generis. Admis-
sion to one not being the equivalent of admission to any other, equal
enjoyment is prevented by the refusal of admission to any one of
them. But can it be said that a colored person or a white person
may demand a particular seat in such a place of amusement? May
not the proprietor assign a place within his house of amusement
which each person may occupy, provided the occupant has "equal
enjoyment" of the entertainment, and the assignment is bona fide?
It has been held that common carriers of passengers by water
may assign different sleeping cabins for colored and white female
passengers, provided they are equal in quality and convenience to
both alike. The Sue (D. C.) 22 Fed. 843. In Green v. City of Bridge-
ton, Fed. Cas. No. 5,754, and in Murphy v. Railroad Co. (C. C.) 23
Fed. 637, the same rule was applied to passengers on railroad trains,
where separate cars were provided for white and colored people;
and the same doctrine has been applied to seats at a table in the
dining room of a steamboat (McGuinn v. Forbes [D. C.] 37 Fed. 639);
and the general principle is recognized in the Case of the Civil Rights
Bill, 1 Hughes, 541, Fed. Cas. No. 18,258. Through all these cases
runs the principle that the accommodations or facilities must be
equal in all respects, and the separation bona fide; and this is the
doctrine announced in all the cases which have come under our ob-
servation. The Gallagher Case was decided in 1883, and the King
Case in 1888; and these cases had declared the law in force at
those dates, at which time the Penal Code had been enacted. The
new constitutional principle of 1894 was promulgated in view of
the law, statutory and common, then existing, and must be construed
with reference thereto. People v. Roberts, 91 Hun, 117, 34 N. Y.
Supp. 641, and 36 N. Y. Supp. 677. We find nothing inconsistent
between the announced law and this new provision. The present
constitution (article 9, § 1) provides that "the legislature shall pro-
vide for the maintenance and support of a system of free common
schools wherein all the children of this state may be educated." This
provision requires no more than that equal facilities in public schools
shall be furnished to all children, white and black, alike. It cannot
be tortured into a declaration that shall bring into conflict with it

the principle declared in the Gallagher Case. We think this is emphasized by section 13 of the address which the convention issued to the people, explaining the new features of the constitution, where it was said, "We have required the legislature to provide for free schools, in which all the children of the state may be educated." In other words, the constitution only requires that free schools, with equal facilities, shall be furnished for all alike. It seems to us that the fundamental error in the appellant's contention is the assumption that the children in question are excluded from the public schools in violation of this section of the constitution. The record shows that they are excluded only from a particular school, not from all schools. For illustration, the children may insist upon their right of admittance to school No. 47 or school No. 48. They cannot insist upon admittance to a particular one of such schools, as, for instance, to No. 47, by virtue of their own preference of that school, so long as equal facilities are provided in school No. 48. The purpose of the constitution is to provide free common schools, wherein all children of this state may be educated; and, as it is admitted in the present record that facilities equal to those of other schools are provided in school No. 48, the relator's contention of exclusion from the benefits of the common-school education fails. This view finds justification in Pierce v. Trustees, 46 N. J. Law, 76, where the supreme court of New Jersey had under consideration the statute of that state (Laws 1881, p. 186) which provided that no child "shall be excluded from any public school in this state on account of his or her religion, nationality or color," and held that the colored children of the relator were entitled to admission to any school. But it is evident that the decision was based on the plain language of the statute, which is very different from that of our own state now under consideration. It may also be said, and such was the decision of the supreme court of the United States in Presser v. Illinois, 116 U. S. 252, 6 Sup. Ct. 580, 29 L. Ed. 615, that:

"It is only the privileges and immunities of citizens of the United States that the clause relied on was intended to protect. A state may pass laws to regulate the privileges and immunities of its own citizens, provided that in so doing it does not abridge their privileges and immunities as citizens of the United States."

It is easy to see that the education of children was not devolved by the constitution of the United States upon the federal government, and consequently is reserved to the several states. Over that subject the states retain supreme control. We are not concerned with the policy of the legislature in regard to the establishment of separate schools for colored children. The court of appeals, in the Gallagher Case, declared the power of establishing such schools to be resident in the legislature; and we find neither any case, nor any suggestion of the appellant's counsel as to subsequent legislation, which weakens the binding authority of that case.

It follows that the order should be affirmed, but, under the circumstances, without costs. All concur.