(73 Misc. Rep. 343.)

PEOPLE v. ROBINSON.

(Court of General Sessions, New York County. August, 1911.)

1. DISORDERLY CONDUCT (§ 1*)—ELEMENTS OF OFFENSE—STATUTORY PROVISIONS.

Consolidation Act (Laws 1882, c. 410) § 1458, making it disorderly conduct for any person in any thoroughfare or public place to use any threatening, abusive, or insulting behavior with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, does not apply to a case where a man sends letters to a woman declaring love and proposing and insisting on marriage in spite of requests to desist and of failure to receive replies, since the provisions of such section apply only to acts in a thoroughfare or public place and which are threatening, abusive, or insulting.

[Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*]

2. DISORDERLY CONDUCT (§ 1*)—ELEMENTS OF OFFENSE—STATUTORY PROVISIONS—"BEHAVIOR."

"Behavior," as used in Consolidation Act (Laws 1882, c. 410) § 1458, making it disordery conduct to use any threatening, abusive, or insult-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing behavior, etc., means demeanor or deportment, and refers to action in the presence of others.

[Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 1, p. 739.]

3. DISORDERLY CONDUCT (§ 1*)—ELEMENTS OF OFFENSE—STATUTORY PROVISIONS.

Where a man upon slight acquaintance sends to a woman letters declaring love and proposing and insisting upon marriage, notwithstanding requests through a third person to desist and his failure to receive any replies, he may be found guilty of a violation of Consolidation Act (Laws 1882, c. 410) § 1459, authorizing any police justice to have brought before him to answer the charge of disorderly conduct any person guilty of such disorderly conduct as in the opinion of the magistrate tends to a breach of the peace.

[Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*]

4. CONSTITUTIONAL LAW (§ 215*)—EQUAL PROTECTION OF LAWS—DISCRIMINATION BETWEEN RACES.

In proceedings before a magistrate for disorderly conduct consisting in sending to a woman letters declaring love and proposing and insisting upon marriage, the reception over defendant's objection of evidence that he is of the negro race; and the taking of that fact into consideration by the magistrate, do not violate any constitutional right of the defendant, and do not deprive him of the equal protection of the laws, nor discriminate against him on account of race or color.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 215.*]

William Robinson was convicted in a city magistrate's court, on complaint of Florence G. Hendrickson, of disorderly conduct, and appeals. Modified and affirmed.

Junius C. Ayler (Junius C. Ayler and Louis A. Leavelle, of counsel), for appellant.

Charles S. Whitman, for the People.

CRAIN, J. This is an appeal from a judgment rendered in a city magistrate's court, convicting the defendant of the offense of disorderly conduct tending to a breach of the peace. For reasons to be stated, it is a matter of dispute whether the conviction purported to be under section 1458 or section 1459 of the Consolidation Act (Laws 1882, c. 410).

It appears from the return that the defendant and the complainant, respectively, a man and woman, attended for some time the same church and there saw each other frequently, but without speaking acquaintance; that finally, upon a certain occasion, the defendant told the complainant that he wished to become a member of such church, but no conversation was had between them; that later, on another occasion, the defendant asked the complainant to allow him to escort her home, to which she replied, "No, I have an escort," but that no further conversation took place between them; that the defendant then wrote to the complainant avowing love and suggesting marriage, and, not knowing her address, he addressed his letter to her in care of a person whom she knew and whose address he knew; that the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

defendant was thereupon asked, at the complainant's request, by the assistant pastor of the church, to desist from writing to her; that he nevertheless continued to write letters to her of the same character; that these all remained unanswered; that he finally wrote to the complainant's father, stating, in substance, that the complainant was under legal obligation to marry him, that her consent was inferable from her silence, that she could not lawfully marry another, and that, in such event, he could sue her for breach of promise; that he substantially repeated orally this contention when arraigned and at the trial; and that the complainant testified that these letters caused her annoyance.

The learned magistrate may well have found from these facts that the transmission of the letters in question by the defendant to the complainant caused wrongful annoyance to the complainant as being an unwarrantable invasion of her right of privacy: First, because the writing and transmission of them were not justified by the nature of the defendant's acquaintance with the complainant; second, because the second and subsequent letters were transmitted after the defendant had been requested to desist by a person acting in that behalf for the complainant; and, third, because these letters were transmitted when, from the nonreceipt of replies, annoyance by the complainant from the receipt of the letters was inferable.

In other words, the learned magistrate may well have found from the evidence that the defendant was endeavoring to enjoy, without the necessary consent of the other party affected—namely the complainant—a social privilege, and was not engaged in attempting to enforce a legal right.

Moreover, the learned magistrate may well have found from the evidence that the defendant's letters caused wrongful annoyance to the complainant in threatening an unwarrantable interference with her liberty of action, in that in them the defendant wrongfully asserted in substance that the complainant was under legal obligation to marry him and that he had a cause of action against her for the recovery of damages for the breach of this obligation; that so causing annoyance, they were provocative; and that, being provocative, they had a tendency to cause a breach of the peace.

Such conclusion it is apparent might have been properly reached by the learned magistrate apart from and without taking into consideration the race of either party or the fact of their difference in race.

While no one can read the letters written by the defendant in the light of the surrounding circumstances as disclosed by the testimony without entertaining grave doubt of the defendant's mental responsibility, as this was assumed, his conduct must, on this appeal, be passed upon on such assumption.

Assuming, therefore, the defendant to have been mentally responsible, and as a consequence to have intended the natural and probable consequences of his act, if the facts disclosed upon the trial had been elicited upon a preliminary examination, the magistrate would have been justified in holding the defendant, either for the Court of Special Sessions, or to await the action of the grand jury, on the charge of

having violated section 551 of the Penal Law (Consol. Laws 1909, c. 40), which, among other things, makes it a misdemeanor for a person to knowingly send a letter with intent thereby to cause annoyance; and the fact that, instead of being so held, he was tried charged with the commission of a lesser offense, to wit, of disorderly conduct tending to a breach of the peace under the provisions of the consolidation act, affords him no ground of complaint.

The record upon appeal presents the following questions:

First. Did the complaint sufficiently allege a violation of either section 1458 or section 1459 of the consolidation act?

Second. Was there reversible error committed by the learned magistrate in directing the insertion in the complaint of a statement to the effect that the complainant was of the Caucasian race and the defendant of the negro race, and by taking testimony respecting the races to which the complainant and defendant belonged, and by taking that circumstance into consideration in the rendition of judgment of conviction?

The return, as filed, indicates that a paper was used in the preparation of the affidavit or complaint which had upon it printed matter and blank spaces designed for the insertion of written matter. Into such spaces written matter was inserted, and afterward the paper was signed and sworn to by the complaining witness. Some printed matter was allowed to remain, appropriate to the charge under section 1458, but not necessary to the charge under section 1459. Such printed matter consisted of the word "street," where it appears after the written words "Borough of Manhattan," and the words "using threatening, abusive, and insulting behavior." The complaint would read connectedly but for the use of the word "street" in such place, and this word where it so appears might properly have been erased.

[1] Section 1458 of the consolidation act is inapplicable to the case as made out by the evidence: Firstly, because the defendant's alleged offense is not shown to have been committed in a thoroughfare or public place; and, secondly, because his behavior does not appear to have been "threatening, abusive, or insulting."

[2] "Behavior," as used in this law, means demeanor or deportment and refers to action in the presence of others.

[3] The case of People v. Mansi, 129 App. Div. 386, 113 N. Y. Supp. 866, following the case of In re Twelve Commitments, 19 Abb. Prac. 394, held that section 1459 embraced any disorderly conduct such as, in the opinion of the magistrate, tended to a breach of the peace; and that the word "such," as so used, did not refer exclusively to the disorderly acts specified in section 1458. Such section, therefore, applied to the defendant's case.

Taking the complaint in its entirety, it may not improperly be construed as charging the defendant with a violation of section 1459; and, although informal, it was sufficient to give the magistrate jurisdiction. People v. Fuchs, 71 Misc. Rep. 69, 129 N. Y. Supp. 1012; People v. Payne, 71 Misc. Rep. 72, 75, 129 N. Y. Supp. 1007.

[4] The learned magistrate caused, as appears from the return,

the words "Caucasian race" to be inserted in the complaint as descriptive of the race to which the complainant belonged, and the words "negro race" to be inserted in the complaint as descriptive of the race to which the defendant belonged; and the validity of the complaint was assailed upon this ground, both by demurrer and motion to dismiss, and exception was taken to the disallowance of the demurrer and the overruling of the motion to dismiss. Over the defendant's objection and exception, the magistrate received evidence going to the point that the complainant was of the Caucasian race and the defendant of the negro race, and by his return the magistrate has certified that he took such circumstance into consideration, stating somewhat at large the reasons which led him to do so. This was not legal error. No constitutional provision and no statute forbids in terms that which the learned magistrate did in this connection.

Article 14, § 1, of the United States Constitution, provides, under the head "Citizens," that no state shall "deny to any person the equal protection of the laws." This phrase "equal protection of the laws" was judicially construed by Mr. Justice Field in a dissenting opinion in the Supreme Court of the United States in Neal v. State of Delaware, 103 U. S. 370, at page 408 (26 L. Ed. 567). There Justice Field says:

"Equal protection of the laws of a state is extended to persons within its jurisdiction, within the meaning of the amendment, when its courts are open to them on the same terms as to others, with like rules of evidence and modes of procedure, for the security of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; when they are subjected to no restrictions in the acquisition of property, the enjoyment of personal liberty, and the pursuit of happiness which do not equally affect others; when they are liable to no other nor greater burdens or charges than such as are laid upon others; and when no different nor greater punishment is enforced against them for a violation of the laws."

This language was cited with approval, in State v. Montgomery, by the Supreme Court of Maine, reported 94 Me. 192, 47 Atl. 165, 80 Am. St. Rep. 386, 392.

Within this definition the judgment appealed from did not subject the defendant to any restriction of personal liberty which did not equally affect others, as his acts, as stated, considered apart from the circumstance of his race, were wrongfully annoying, and hence provocative.

In this state what was known as Bill of Rights, § 22, provided, as did chapter 186, Laws of 1873, which was repealed by the Consolidated Laws, that:

"*Discrimination against* any citizen on account of color by the use of the word 'white' or any other term in any law, statute, ordinance or regulation now existing in this state is repealed and annulled."

These repealed statutes, except as they indicated a legislative policy against invidious discrimination on the score of color, would, even if the law to-day, be manifestly inapplicable.

There may be a statutory recognition of the existence of different races without the violation of any constitutional or statutory pro-

vision against racial discrimination. It is not "discrimination," but "discrimination against"—that is, in opposition to—which the law condemns.

This was made plain in the case of People ex rel. King v. Gallagher, 93 N. Y. 438, at page 448 (45 Am. Rep. 232), which involved the right of a colored child to attend a certain public school. In that case Chief Judge Ruger, delivering the opinion of the court, moreover, said:

"In the nature of things there must be many social distinctions and privileges remaining unregulated by law and left within the control of the individual citizens, as being beyond the reach of the legislative functions of government to organize or control. The attempt to enforce social intimacy and intercourse between the races, by legal enactments, would probably tend only to embitter the prejudices, if any such there are, which exist between them, and produce an evil instead of a good result. Roberts v. City of Boston, 5 Cush. [Mass.] 198. As to whether such intercourse shall ever occur must eventually depend upon the operation of natural laws and the merits of individuals, and can exist and be enjoyed only by the voluntary consent of the persons between whom such relations may arise. * * * The claim, which is now made, that any distinction made by law and founded upon difference of race or color is prohibited by the Constitution, leads to startling results and is not believed to be well founded. * * * A natural distinction exists between these races which was not created, neither can it be abrogated, by law."

When, as in the case at bar, the question in issue is the effect or tendency of an act or of a course of conduct, may not consideration be given to difference of race between the parties concerned?·

Jurors have a right to consider in reaching verdicts the appearance of witnesses, including the parties to the action when they become such, and in that connection, when of probative value, all physical characteristics as apparent sex, age, size, weight, etc. They have the right in such connection to draw comparisons and to reach conclusions upon the issue submitted to them, in part arrived at from such observations. A large man of apparently powerful physique charges a cripple with having assaulted him. The credit to be attached to the latter's denial is increased by the appearance of the parties. A question of identification arises in a case, and a witness testifies that the person committing the assault was a white man and the defendant on trial is a negro. It is testimony having its point in and taking cognizance of a racial difference; but it is available and, if believed, persuasive.

There have been instances, indeed, in which trial judges in charges to juries have alluded to the race of witnesses, as, for example, as being Indians, white men, etc.; and, where such allusions have drawn no distinctions on the score of race as between witnesses, they have been held proper, or at least nonprejudicial, upon appeal. Hall v. Sims (D. C.) 35 Fed. 152; Shelp v. United States, 81 Fed. 694, 698, 699, 26 C. C. A. 570.

If juries may not improperly take cognizance of the race to which a witness belongs, the court, acting without a jury, may do so.

By way of more analogous illustration, say that in a given locality from possibly purely temporary and local causes there is as matter

of common knowledge antagonism between laborers of Irish birth and those of the Italian race, and the tendency of an act by a member of one such race to a member of the other considered from the standpoint of its likelihood to cause a breach of the peace becomes the subject of judicial inquiry. Must the court close its eyes to such racial difference and such existing feeling, or may it take both into consideration in determining the issue? It is plainly reasonable to consider both; and, if the recognition proceed no further and penalizes no one because of race, it is not counter to the spirit of our laws. No more than such reasonable consideration was given in the case at bar.

The circumstances considered by the learned magistrate in connection with the question of race was not the defendant's race intrinsically considered, but the fact that the defendant's race was different from that of the complainant. Reference to race is distinguishable from discrimination on account of race. In the case at bar reference was made to the races to which the parties belonged, but no circumstance appearing warrants the conclusion that the defendant was discriminated against on account of race.

There is, doubtless, a distinction between taking cognizance of a fact and attaching to it a probative weight or significance.

Whether the magistrate should or should not have accorded weight to such circumstance in reaching a conclusion as to whether the act of the defendant was one having a tendency to produce a breach of the peace as distinguished from the question as to whether he should or should not have taken it into consideration in that connection is a matter of opinion and not of law. The return affirmatively shows that he did not attach to it controlling weight, and that his decision would have been the same irrespective of it; and, as the conclusion has been reached that irrespective of it his decision was warranted by the evidence, if error was committed by him in the respect mentioned, it was nonprejudicial.

In the case of Griffin v. Brady, 133 App. Div. 939, 118 N. Y. Supp. 240, the Appellate Division, without expressing either approval or dissent, declined to reverse a discretionary order made at Trial Term which reduced a verdict upon several grounds; one being the race to which the plaintiff belonged. This case, at least, enforces the principle that the giving among a number of valid reasons for discretionary action a possibly invalid one affords no ground for reversal; and, by analogy, it tends to require the affirmance of this judgment, supported as it is by ample evidence, even though one reason assigned for its rendition be considered erroneous.

Judgment modified by reducing the term of imprisonment to three months, and, as so modified, affirmed.

Judgment modified, and, as so modified, affirmed.